IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| NELSON GAMACHE*, et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No. 1:19-CV-21 (LAG) |
| | : | |
| JOHN F. HOGUE, Jr., *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. 195) and Plaintiffs' Motion for Partial Summary Judgment (Doc. 196). For the reasons set forth below, Defendants' Motion is **DENIED** and Plaintiffs' Motion is **GRANTED in part and DENIED in part**.

## PROCEDURAL BACKGROUND

On January 29, 2019, Plaintiffs Nelson Gamache and Edward Nofi filed this putative class action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, against Defendants John F. Hogue, Jr., Graham Thompson, James Urbach, Glenn Kirbo, Randy Hall, John Does 1–20, and the Administrative Committee of the Technical Associates of Georgia, Inc. Employee Stock Ownership Plan. (Doc. 1). Plaintiffs amended their Complaint on April 19, 2019. (Doc. 30). Plaintiffs, former employees of Technical Associates of Georgia, Inc. (TAG) and participants in the TAG Employee Stock Ownership Plan (ESOP), allege that Defendants engaged in prohibited transactions and breached fiduciary duties in violation of 29 U.S.C. §§ 1104(a)(1), 1105, 1106(a)(1)(D), and 1106(b). (*Id.* at 26–33). Plaintiffs seek various relief, including the voiding of prohibited transactions, the disgorgement of profits from such transactions, a constructive trust over proceeds from such transactions, and Defendants' removal as ESOP fiduciaries. (*Id.* at 34–35).

On May 24, 2019, Defendants filed a Motion to Dismiss (Doc. 36), which the Court denied on March 16, 2020 (Doc. 43). The Parties filed cross Motions for Summary Judgment on February 10 and 17, 2022, respectively. (Docs. 142, 155). The Court denied both Motions on August 17, 2022, and reset the relevant discovery deadlines. (Doc. 187). The Parties refiled their respective Motions on September 30, 2022. (Docs. 195, 196). The Parties filed their respective Responses (Docs. 198, 201) and Replies (Docs. 200, 205), and the Motions are now ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting

2

evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the nonmoving party must demonstrate that there is a genuine dispute for trial. *Gogel*, 967 F.3d at 1134 (citing *Celotex Corp.*, 447 U.S. at 324). The nonmovant must "go beyond the pleadings and [] present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (citing *Celotex Corp.*, 477 U.S. at 324). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

## FACTUAL ALLEGATIONS

TAG is a Georgia corporation, founded in 1980 by Randall E. Wages and Stephen H. Harrison, which provides "staffing services, engineering services, and technical services to owners of industrial manufacturing facilities throughout the United States."[1] (Doc. 195-2 ¶ 1; Doc. 201-1 ¶ 1; Doc. 196-2 ¶ 46; Doc. 198-2 ¶ 46). Defendants Hogue, Thompson, and Kirbo have been members of TAG's Board of Directors (Board) since 2006. (Doc. 195-2 ¶ 18; Doc. 201-1 ¶ 18). Hogue is TAG's president of operations and Thompson is TAG's president of engineering. (Doc. 195-66 ¶ 2; Doc. 195-67 ¶ 1; Doc. 195-78 at 25:2–5; Doc. 195-77 at 44:25–45:8). Defendant Hall is also a member of TAG's Board. (*See* Doc. 195-80 at 20:24–21:4, 36:22–37:4).

In 2006, TAG established the Employee Stock Ownership Plan (ESOP). (Doc. 195-2 ¶¶ 4–5; Doc. 201-1 ¶¶ 4–5). The ESOP is run by the Administrative Committee, which

---

[1]     The Court derives the relevant facts from the Parties' Statement of Material Facts (Docs. 195-2, 196-2), their respective responses (Docs. 198-2, 201-1), and the record. When evaluating the Motion for Summary Judgment, the Court construes the facts in the light most favorable to the nonmoving party. *See Johnson v. City of Mia. Beach*, 18 F.4th 1267, 1269 (11th Cir. 2021) (citation omitted).

is appointed by TAG's Board. (Doc. 195-2 ¶ 6; Doc. 201-1 ¶ 6; Doc. 196-2 ¶ 5; Doc. 198-2 ¶ 5; Doc. 195-7 at 15). The ESOP's assets are held in the Employee Stock Ownership Trust (Trust). (Doc. 195-2 ¶ 5; Doc. 201-1 ¶ 5). Hogue, Thompson, and Kirbo have been Administrative Committee members since the ESOP's founding. (Doc. 196-2 ¶¶ 1–3, 6–7; Doc. 198-2 ¶¶ 1–3, 6–7; Doc. 195-76 at 210:9–17). The Administrative Committee is responsible for holding and investing the funds contributed to the ESOP. (*See* Doc. 195-7 at 15–18). The Trust is governed by various trust agreements and is managed by trustees, whom the TAG Board appoints. (Doc. 195-2 ¶¶ 7–8; Doc. 201-1 ¶¶ 7–8; Doc. 196-2 ¶ 4; Doc. 198-2 ¶ 4). Kirbo served as an ESOP trustee until June 22, 2011, when Defendant Urbach succeeded him. (Doc. 195-2 ¶ 44; Doc. 201-1 ¶ 44; Doc. 196-2 ¶¶ 20–21; Doc. 198-2 ¶¶ 20–21). Defendants Thompson and Hogue became trustees in 2012 and served in that role until Defendant Kirbo resumed as trustee in 2020. (*See* Doc. 195-78 at 31:9–32:18; Doc. 195-77 at 65:6–21).

At its formation in 2006, the ESOP bought all outstanding TAG stock from Wages and Harrison, the company's founders, using a $1.5 million cash contribution from TAG and $16 million in term loans from Wages and Harrison. (Doc. 195-2 ¶¶ 10–11; Doc. 201-1 ¶¶ 10–11). The $16 million loans were guaranteed by the ESOP's stock. (Doc. 195-2 ¶ 11; Doc. 201-1 ¶ 11). Thus, at its formation, the ESOP was "required [] to pledge the stock it purchased to [Wages and Harrison] as collateral for the loan." (Doc. 195-2 ¶ 12(f); Doc. 201-1 ¶ 12). Hogue and Thompson, who assumed the day-to-day responsibilities of running the company, also received grants of TAG stock and stock options as part of the transaction. (Doc. 195-2 ¶ 13; Doc. 201-1 ¶ 13).

In 2011, TAG refinanced the ESOP's outstanding debt to Wages and Harrison through a series of interrelated agreements known as the 2011 Refinancing. (Doc. 195-2 ¶¶ 63, 66–71; Doc. 201-1 ¶¶ 63, 66–71; Doc. 196-2 ¶¶ 26–34; Doc. 198-2 ¶¶ 26–34). As part of the 2011 Refinancing:

- TAG borrowed $8 million from Atlantic Capital Bank (Atlantic). (Doc. 196-2 ¶ 50; Doc. 198-2 ¶ 50).
- TAG assumed the ESOP's obligations to Wages and Harrison under the 2006 loan

- documents, and Wages and Harrison released the unallocated shares that the ESOP had pledged as collateral (Doc. 195-2 ¶ 66; Doc. 201-1 ¶ 66).

- TAG used the proceeds of the Atlantic loan to repay Wages and Harrison for their assignment of the ESOP loans. (Doc. 195-2 ¶ 69; Doc. 201-1 ¶ 69).

- The ESOP simultaneously entered into a new loan agreement with TAG for a loan in an amount equal to the outstanding balance of the loan from Wages and Harrison. (Doc. 195-2 ¶ 67; Doc. 201-1 ¶ 67).

- TAG pledged certain assets to Atlantic, including the ESOP loan documents, as collateral for the 2011 Bank Refinance. (Doc. 195-2 ¶ 68; Doc. 201-1 ¶ 68; Doc. 196-2 ¶ 51; Doc. 198-2 ¶ 51).

- Hogue and Thompson personally guaranteed the Atlantic loan. (Doc. 195-2 ¶ 33; Doc. 201-1 ¶ 33; Doc. 196-2 ¶ 31; Doc. 198-2 ¶ 31).

- TAG gave Hogue and Thompson additional grants of TAG stock, stock options, and cash payments. (Doc. 195-2 ¶ 50; Doc. 201-1 ¶ 50; Doc. 196-2 ¶ 26; Doc. 198-2 ¶ 26).

- TAG issued 12,941 shares of common stock each to Hogue and Thompson. In exchange, Hogue and Thompson each signed $882,706 promissory notes payable to TAG. (Doc. 195-2 ¶ 50; Doc. 201-1 ¶ 50; Doc. 196-2 ¶¶ 27, 42; Doc. 198-2 ¶¶ 27, 42). The notes provided that the interest and principal would be forgiven every year as long as Hogue and Thompson remained TAG employees. (Doc. 195-2 ¶ 50; Doc. 201-1 ¶ 50).

Prior to closing the 2011 Refinance, the Board of Directors voted to amend its Articles of Incorporation to allow the issuance of up to 300,000 shares. (Doc. 195-3 ¶ 167). In 2012, TAG refinanced its Atlantic debt with SunTrust Bank. (Doc. 195-2 ¶ 72; Doc. 201-1 ¶ 72).

The Parties dispute whether Defendants properly disclosed information related to the 2011 Transaction. Specifically, the Parties dispute whether the Form 5500s filed by the ESOP properly indicated the ownership shares of TAG.[2] (Doc. 195-2 ¶ 79; Doc. 201-1 ¶

---

[2]    IRS Form 5500, Annual Return/Report of Employee Benefit Plan is to be filed by "[t]he employer maintaining the plan or the plan administrator of a Pension or Welfare benefit plan covered by ERISA" and

79; Doc. 196-2 ¶ 48; Doc. 198-2 ¶ 48). The 2011 Form 5500 stated that there were no non-exempt transactions with any party-in-interest and did not disclose any stock acquisitions by TAG executives. (Doc. 195-63 at 7; Doc. 195-2 ¶ 79; Doc. 201-1 ¶ 79; Doc. 196-2 ¶ 48; Doc. 198-2 ¶ 48). According to Plaintiffs, Thompson, Hogue, and other TAG management told Plaintiffs and other ESOP participants that TAG was "ESOP-owned" or "employee-owned" on multiple occasions after the ESOP's formation; and Thompson repeatedly told employees "this is your company" and "you're the owners." (Doc. 30 ¶ 67). Furthermore, according to Plaintiffs, Thompson, during a 2014 staff meeting, was asked about the ESOP's depreciation in value over the prior two years and explained the depreciation as the result of "bank juggling." (*Id.* ¶ 68).

Plaintiffs allege that the Board's failure to disclose TAG's change in ownership structure was designed to conceal the transactions through which ESOP fiduciaries acquired interests in TAG. (*Id.* ¶ 72). They further allege that the Board concealed the details of the 2011 Refinancing until after Plaintiffs filed this lawsuit and still have not disclosed the ESOP's exact ownership share in TAG, and that Hogue, Thompson, and the Administrative Committee concealed Hogue and Thompson's stock ownership in order to prevent ESOP participants from challenging the 2011 Refinancing. (*Id.* ¶¶ 72–73). The Amended Complaint alleges four counts:

(I)    that, as members of the TAG Board and ESOP Administrative Committee, Hogue and Thompson engaged in prohibited plan-fiduciary transactions by dealing with ESOP assets in their own interest and by receiving consideration for their personal accounts in connection with a transaction involving ESOP assets, in violation of 29 U.S.C. § 1106(b)(1) and (3), (*id.* ¶¶ 80–86);

(II)   that as ESOP trustee, Urbach caused the ESOP to engage in transactions that he knew or should have known constituted transfers of ESOP assets to parties-in-interest (Hogue and Thompson), and that Hogue and Thompson knowingly

---

is used to report "information on the qualification of the plan, its financial condition, investments and the operations of the plan." *Form 5500 Corner*, IRS, https://www.irs.gov/retirement-plans/form-5500-corner (last visited Sept. 27, 2023).

participated in those transactions, in violation of § 1106(a)(1)(D), (*id.* ¶¶ 87–92);

(III)    that Urbach breached his fiduciary duties under § 1104(a)(1) by approving the 2011 Refinancing, and that he and the ESOP Administrative Committee (Hogue, Thompson, and Kirbo) breached their duties under §§ 1104(a)(1)(A) and (B) and 1105(a)(2) and (3) by failing to remedy the prohibited transactions alleged in Counts I and II, (*id.* ¶¶ 93–107);

(IV)    that the members of the TAG Board (Hogue, Thompson, Kirbo, and Hall) breached their duties under § 1104(a)(1)(A) and (B) by failing to monitor or take appropriate action against Urbach, Hogue, and Thompson, (*id.* ¶¶ 108–13).

## DISCUSSION

### I.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on three grounds: (1) "th[e] documents show that the Executives were not fiduciaries with respect to the transactions"; (2) "ERISA does not govern Plaintiffs' claims"; and (3) "even if [ERISA] did [govern their claims], Plaintiffs' claims either would be time-barred or would fail on their merits." (Doc. 195-1 at 1–2) (emphasis omitted).

### A.    Timeliness of Claims

The Court first addresses whether Plaintiffs' ERISA §§ 404, 405(a)(2), and 406 claims are time-barred. Defendants argue that "Plaintiffs' ERISA § 406 claims in Counts I and II, and their ERISA §§ 404 and 405(a)(2) claims in Counts III and IV—all of which are predicated on the 2011 Transactions—are time-barred under ERISA § 413(1)." (Doc. 195-1 at 7). Additionally, with regard to Count III, Defendants argue that "even if [Defendant] Urbach owed a duty to rescind the 2011 Transactions while he was Trustee. . . the last date he could have taken steps to do so was immediately prior to his resignation in January 2012" and "[b]ecause Plaintiffs filed this lawsuit more than six years after Urbach resigned, their claim against him under ERISA § 405(a)(3) is time-barred." (*Id.* at 24). Defendants assert that "[t]he repose period for [all of Plaintiff's claims] [] expired on August 22, 2017" and "[b]ecause Plaintiffs did not file their initial complaint until January 2019, the claims are time barred." (*Id.* at 7). Defendants further argue that Plaintiffs do not

7

qualify for the "fraud and concealment exception to toll commencement of ERISA's repose period" because "Plaintiffs have provided no evidence of affirmative fraud or concealment." (*Id.* at 8) (emphasis omitted).

"In order to constitute fraud or concealment such that the six year statute of limitations is applicable, a plaintiff must establish that the defendant engaged in 'an active step of concealment[.]'" *Lockhart v. S. Health Plan, Inc. Plan Adm'r*, No. 4:04-CV-0006-WLS-MSH, 2012 WL 1576160, at *7 (M.D. Ga. May 4, 2012), *aff'd* 503 F. App'x 926 (11th Cir. 2013) (quoting *Mellon Bank, N.A. ex. rel. Weiss Packing Co., Inc. Profit Sharing Plan v. Levy*, 71 F.App'x 146, 148 (3d Cir. 2003) (alteration in original). Thus, Plaintiff must present evidence of "conduct beyond the breach itself that ha[d] the effect of concealing the breach from its victims" and that such conduct included "affirmative steps [at any point] to hide its breach of fiduciary duty." *Id.* (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 503 (3d Cir. 2001) (second alteration in original) (emphasis omitted)); *see also id.* (collecting cases).

This Court has previously held that Plaintiffs "satisfied the heightened pleading standard and set forth facts with sufficient particularity to allege fraud and concealment." *Gamache v. Hogue*, 446 F. Supp. 3d 1315, 1329 (M.D. Ga. 2020). Specifically, the Court held that Plaintiffs "sufficiently [pled] the 'who, what, when, where, and how'" of the following allegedly false statements:

> (1) misleading statements on the ESOP's 2011–14 Form 5500s, all signed by Thompson, that declared the ESOP had "purchased all of the outstanding stock of [TAG];" (2) the 2011 Form 5500's statement that there were no non-exempt transactions with parties-in-interest; (3) the 2011 Form 5500's omission of any "Related Party Transactions;" (4) Thompson's 2014 statement to TAG employees at the Albany office that the ESOP's depreciation in value over the prior two years was due to "bank juggling;" and (5) Thompson's directing Gamache to the Form 5500s in response to questions about the ESOP in an August 2016 meeting at the Albany office.

*Id.* (third alteration in original) (first quoting *Mizarro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008); and then quoting (Doc. 30 ¶¶ 62, 65–66, 68)).

Now, at the summary judgment stage, Plaintiffs have presented evidence which creates a genuine issue of material fact as to whether Defendants actively sought to conceal their actions and the effects of the 2011 Transaction. As discussed in detail below, the evidence before the Court creates "a genuine issue for trial." *Lamar*, 597 F. App'x at 557 (citation omitted). For example, Plaintiffs point to differences between TA's public-facing documents—the Form 5500s—which state that the ESOP "purchased all of the outstanding stock of the Company from its two former stockholders," but that do not disclose that the ESOP "owned anything less than 100% of TA[,]" and the non-public financial statements, which detail the "equity awards to Hogue and Thompson." (Doc. 201 at 19; *see* Doc. 195-63 at 26; *see also* Doc. 166-37 at 14). Plaintiffs also point to an email from Hogue to the company explaining the refinancing without disclosing "that the 2011 Refinance would result in the ESOP owning only 60% of TA." (Doc. 201 at 20; *see* Doc. 195-54 at 2). Additionally, when Plaintiff Gamache "raised questions with the Board about the ESOP, the Board's lawyer sent him a letter[,]" which stated that he was "entitled only to a copy of the ESOP plan documents, a copy of the latest annual report (Form 5500), a summary of the Annual Financial Report for the ESOP (already furnished to [him]), and a statement with regard to [his] vested rights in the ESOP, which is provided annually." (Doc. 201 at 21; Doc. 166-7 at 2). In response to Plaintiff Gamache's question regarding whether the ESOP owns the same percentage of stock today as in 2006, the letter provides generally that "additional stock was made available to key executives as a condition of [the] loan, in order to incentivize them to assure that the Company succeeded and repaid the loan in full. The ESOP continues to own a majority of the outstanding stock in the Company." (Doc. 166-7 at 3). The letter did not provide details regarding the equity awards provided to Hogue and Thompson or the changes and ownership, and further stated that the information provided therein "goes well beyond what the Company, the Board, or ESOP trustees are required to provide to any ESOP participant" and that "the Board will not be providing [Plaintiff Gamache] with any additional information regarding these matters." (*Id.* at 4).

Plaintiffs also point to evidence of information shared with new employees and prohibitions on discussing compensation and benefits. For example, "[u]ntil at least 2018,

TA recruiters affirmatively told new hires—as a part of their recruitment pitch—that TA was owned 100% by the ESOP." (Doc. 201 at 20 (first citing Doc. 166-55 ¶¶ 3, 8, 10; and then citing Doc. 201-14 at 40:3–15, 54:7–55:23, 57:22–58:8)). In her Declaration, HR Specialist and Recruiter Kristi Coates stated that "[f]rom the start of [her] employment" in March 2015, she "was told that TA was owned entirely by the Technical Associates of Georgia, Inc. Employee Stock Ownership Plan (the 'ESOP')" by her senior coworkers and other recruiters. (Doc. 166-55 ¶ 3). Coates further stated that when she "learned that the ESOP no longer owned 100% of TA and that [Defendants] Hogue and [] Thompson owned stock in TA outside the ESOP[,]" she "stopped describing TA as 100% owned or completely owned by the ESOP to prospective employees" and did not discuss this information, "or whether recruiters should change how they describe the ESOP benefit with other TA recruiters or any managers" because she "was concerned about adverse consequences for [her] or other persons with whom [she] might discuss the issue." (Doc. 166-55 ¶¶ 10–11). Plaintiffs also refer to a declaration and several employee depositions during which current and former employees claim that they believed that the ESOP still owned 100% of TA and were unaware that Thompson and Hogue received any additional stock. (*See* Doc. 201 at 20–21; Doc. 201-8 at 27:21–29:13, 32:8–33:11; Doc. 201-9 at 16:14–19:9; Doc. 201-10 at 19:1–7, 39:9–40:21, 50:22–52:4; Doc. 195-84 at 19:14–18, 20:6–12, 74:2–15, 100:14–21; Doc. 201-11 at 31:3–32:14, 35:3–17; Doc. 201-12 at 13:4–7, 14:7–16, 18:12–20; Doc. 201-13 at 58:11–59:3; Doc. 166-56 ¶¶ 6–7).

Moreover, during the August 10, 2022 evidentiary hearing, Expert Jeffrey Krenzel testified "[i]t's important for the employees of an ESOP company to know how much of the company they own" and that he had "never seen an ESOP transaction where the employees were not informed as to how much of the company they owned post transaction." (Doc. 201-17 at 32:20–33:3). Plaintiffs also presented evidence that employees were prohibited from discussing pay and benefits and that the prohibition acted to reduce the chance that Plaintiffs would discover information about their reduced ownership. (Doc. 201 at 20 n.5). Specifically, TAG's "Employee Compensation Confidentiality Statement" provides that TAG employees are "not to discuss their pay with

10

other employees, employees of [its] customers, or employees of any other companies with which they are working" and that "[s]uch a disclosure may be grounds for immediate dismissal." (Doc. 166-39 at 15).

Considering the facts in the light most favorable to Plaintiffs, the non-moving party, there is a genuine issue of material fact as to whether Defendants engaged in an active step of concealment, and summary judgment based on the timeliness of Counts I through IV is not appropriate.

### B. Count I

Count I alleges that Defendants violated ERISA § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3) by (1) "entering into Agreements which formed a part of the 2011 Refinancing" and "deal[ing] with the assets of the Plan in their own interest and/or for their own account"; and (2) "acquiring Technical Associates stock . . . , the option to purchase Company stock in the future, [] cash payments from the Company, [and] subsequent payment of dividends," in connection with the 2011 Refinancing, thereby "receiv[ing] consideration for their personal account from the Company, a party dealing with the Plan in connection with the 2011 Refinancing." (Doc. 30 ¶¶ 85–86). ERISA § 406(b)(1) "prohibits a fiduciary from dealing 'with the assets of the plan in his own interest or for his own account.'" *Owens v. Metro. Life Ins. Co.*, 210 F. Supp. 3d 1344, 1355–56 (N.D. Ga. 2016) (quoting 29 U.S.C. § 1106(b)(1)). ERISA § 406(b)(3) prohibits "[a] fiduciary with respect to the plan" from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). "As defined by ERISA, 'a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.'" *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017) (omission in original). Defendants, "as [] plan administrator[s], w[ere] fiduciar[ies] under this definition." *Owens*, 210 F. Supp. 3d at 1350. Moreover, both Defendant Thompson and Defendant Hogue

understood themselves to be fiduciaries of the plan and plan administrators. (*See* Doc. 195-78 at 45:3–18; Doc. 195-77 at 56:23–57:21).

"Not every action a fiduciary takes, however, is undertaken as a fiduciary. ERISA fiduciaries may wear multiple hats, and they 'may have financial interests adverse to beneficiaries.'" *Owens*, 210 F. Supp. 3d at 1350 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000)); *Pizarro v. Home Depot. Inc.*, No. 1:18-CV-01566-WMR, 2019 WL 11288656, at *6 (N.D. Ga. Sept. 20, 2019) ("In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person . . . was performing a fiduciary function when taking the action subject to complaint." (quoting *Pegram*, 530 U.S. at 225–26) (internal quotation marks omitted) (omission in original))). "Acting adversely to a beneficiary's interest alone is not enough. The actions must have been undertaken when 'that person was acting as a fiduciary (that is, was performing a fiduciary function)' as well." *Owens*, 210 F. Supp. 3d at 1350 (quoting *Pegram*, 530 U.S. at 226).

Here, Defendants argue that the Executives were not acting in their fiduciary capacities during the transaction at issue because the Executives were not "individually exercis[ing] any discretion in Plan administration when they received cash and stock outside the ESOP from TA under the 2011 Employee Agreements [] or when the BOD voted to approve those agreements." (Doc. 195-1 at 17–18; *see* Doc. 198 at 8–18). Defendants further argue that neither receiving the cash/stock nor voting to approve the employment agreements were plan administration and that the Executives abstained from each vote related to their compensation and equity. (Doc. 195-1 at 17–18; *see* Doc. 198 at 12–13). Plaintiffs in turn argue that Defendants Thompson and Hogue were fiduciaries at the time of the 2011 Refinance because (1) they were members of the Board, (2) they acted as the Plan Administrator, and (3) they took "specific actions in a fiduciary capacity" during the Refinance by "monitoring the Trustee, making disclosures to the Department of Labor, and communicating with employees regarding the 2011 Refinance's impact on their ESOP benefits." (Doc. 201 at 29–36; *see* Doc. 196-1 at 14–19).

"The fiduciary function is not an 'all-or-nothing concept,' and a defendant is only a fiduciary to the extent that he exercises discretionary authority 'with respect to the particular activity at issue.'" *Pledger*, 240 F. Supp. 3d at 1322 (quoting *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005)); *see also Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs.*, No. 1:09-cv-1164-WSD, 2012 WL 12948705, at *13 (N.D. Ga. Jan. 11, 2012). "Generally speaking, a person or entity becomes an ERISA fiduciary either by being named as a fiduciary in written instruments that govern how an employee benefit plan is established or maintained [i.e., a 'named fiduciary'], or by exercising discretionary authority or control over the management, administration, or assets of a plan [i.e., a 'functional fiduciary]." *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 WL 10886802, at *11 (N.D. Ga. Mar. 28, 2019) (alterations in original) (internal quotation marks omitted) (quoting *Woods v. S. Co.*, 396 F. Supp. 2d 1351, 1364 (N.D. Ga. 2005)). Thus, "a fiduciary act is a discretionary act" and determining whether a party is an ERISA fiduciary is therefore "a mixed question of law and fact." *Id.* (first citing *Herman v. NationsBank Tr. Co., (Georgia)*, 126 F.3d 1354, 1365 (11th Cir. 1997); and then quoting *Cotton*, 402 F.3d at 1277). As such, "[p]roof of who is the plan administrator [or plan fiduciary] may come from the plan document, but can also come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation of the plan document." *Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc.*, No. 1:14-CV-1807-RWS, 2015 WL 1395130, *3 (N.D. Ga. Mar. 25, 2015) (quoting *Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 824 (11th Cir. 2001)).

Defendants claim that "neither of the Executives actually performed a fiduciary function with respect to the 2011 Transactions," thus releasing them from liability under the ERISA § 406(b) claims. (Doc. 195-1 at 16–17). Defendants also argue that neither Defendant Thompson nor Defendant Hogue exercised discretion in Plan administration "when they received cash and stock outside the ESOP from TA under the 2011 Employment Agreements, or when the BOD voted to approve those agreements." (Doc. 195-1 at 17–18). Defendants argue that neither of these actions "constituted Plan

13

'administration'" and that both Executives "abstained each time the BOD met to discuss their compensation and equity, when the BOD met with the Trustee about his findings, and when the BOD voted to approve the 2011 Transactions." (*Id.* at 18 (emphasis omitted)).

Viewing the evidence in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether Defendants Thompson and Hogue were, in fact, acting in their fiduciary capacities at relevant times during the 2011 Transactions. First, Plaintiffs have presented evidence that Defendants Graham and Thompson understood themselves to be fiduciaries of the plan and plan administrators. (*See* Doc. 195-78 at 45:3–46:11; Doc. 195-77 at 56:23–57:21). Moreover, as members of the Board of Directors (*see* Doc. 195-2 ¶ 18; Doc. 196-2 ¶¶ 2–3), Defendants Thompson and Hogue had the authority to appoint a Trustee and a Plan Administrator, as they did in connection with the transactions at issue when they voted to replace Defendant Glenn Kirbo with James Urbach as successor trustee of the Trust. (Doc. 195-4 at 35 § 13; Doc. 195-2 ¶ 44; Doc. 195-3 ¶ 140–41; *see* Doc. 195-33; Doc. 196-2 ¶ 20).

Furthermore, while Thompson and Hogue abstained when the Board of Directors met to discuss their compensation and equity, met with the Trustee about his findings, and voted to approve the 2011 Transactions, there is evidence to suggest that both Defendants inserted themselves in the voting process.[3] Both Defendants met with Defendant Kirbo and communicated with him multiple times, including "basically accus[ing] [him] of dragging [his] feet on the comp side of the deal. . . and the corporate decision on the loan" (Doc. 195-76 at 120:1–12). Defendant Kirbo, in fact, testified to having sent a letter to Randy Smith discussing an increase in Defendants Thompson and Hogue's compensation after feeling "challenged" by an email sent by Defendant Hogue on March 28, 2011. (*Id.* at 105:16–106:11; *see* Doc. 165-1). Defendant Kirbo sent a copy of the confidential draft of

---

[3] The Court previously held, when determining if Thompson and Hogue's communications with Counsel in relation to the 2011 Loan were protected attorney client communication, that "Defendants Hogue and Thompson had fiduciary roles in the 2011 Loan transaction and the Loan involved in the Plan" and "[a]ny advice Moore[, the Board's attorneys,] may have given to Defendants Hogue, Thompson, or TAG in connection with it falls under the fiduciary exception and is discoverable regardless of Moore's contention that his representation was limited to non-fiduciary matters." *Gamache v. Hogue*, 595 F. Supp. 3d 1344, 1354 (M.D. Ga. 2022).

14

this letter to Defendants Thompson and Hogue on April 3, 2011. (Doc. 165-1 at 2). In the March 28, 2011 email, Defendant Hogue stated "[t]he bank has told us flat out that there will be no deal without that guarantee and we can also tell you flat out that there will be no personal guarantee, therefore no refinance (which greatly benefits the company) without due consideration." (Doc. 166-27 at 3). Defendant Hogue further stated, "if we cannot work something out, please be prepared to line up someone for the upcoming renewal of the current credit lines with Regions cause we aint gonna sign that either . . . I suggest that we address this at the upcoming board meeting." (*Id.*). On March 29, 2011, Defendant Kirbo forwarded this email to Randy Smith and Mike Hartman and shared that "[Defendant] Thompson called and wanted to come over to discuss why we did not have [a] response. Graham came over and we got [Defendant] John Hogue on [the] phone and basically they. . . quizzed me about where I was (where we were in our response) . . . for over an hour." (*Id.* at 2). During his meeting with Defendants Thompson and Hogue, Defendant Kirbo "discussed the 1. compensation, 2. stock (options v[.] sars), 3. possible new trustee, 4. changes to corporate board etc.[,] 5. developing replacement execs, 6. where they would end up [in] stock ownership %[,] and 7. why the ESOP could not do some of the things being asked of it." (*Id.*).

There is a genuine issue of material fact as to whether Defendants Thompson and Hogue were acting in their fiduciary capacities in relation to the 2011 Transactions at issue. Accordingly, summary judgment is not appropriate as to Count I.

### C. Count II

Count II alleges that Defendants violated ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D). (Doc. 30 ¶¶ 87–92). Specifically, Plaintiffs allege that "Defendant Urbach caused the ESOP to enter into the 2011 Refinancing, which included the pledging of ESOP shares to the Company and the issue of Company stock to Defendants Hogue and Thompson[,]" causing "a transfer and use of the assets of the Plan to and for the benefit of Defendants Hogue and Thompson" in violation of ERISA § 406(a)(1)(D). (*Id.* ¶ 91). Plaintiffs further allege that Defendants Thompson and Hogue "can be held liable" as "parties-in-interest. . . for [their] knowing participation in these violations." (*Id.* ¶ 92).

15

ERISA § 406(a)(1)(D) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect. . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106(a)(1)(D). 29 U.S.C. § 1002(14)(A), (C), and (H) defines a party in interest as "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such benefit plan[,]" as well as "an employer any of whose employees are covered by such plan[,]" and "an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors."

In their Motion for Summary Judgment, Defendants argue that "Count II fails on its merits" because "the ESOP's pledge of its unallocated shares to TA pursuant to a separate agreement in August 2011. . . on its face, meets the requirements of specific exemptions from the prohibition in ERISA § 406(a)(1)(D) that Congress created for employers to make loans to ESOPs" pursuant to 29 U.S.C. §§ 1108(b)(3) and 26 U.S.C. 4975(d)(3).[4] (Doc. 195-1 at 22). "ERISA strictly limits contracts between an ERISA-governed plan and parties in interest to the plan [] [e]xcept as provided by 29 U.S.C. § 1108." *Comerica Bank*, 2012 WL 12948705, at *17. 29 U.S.C. § 1108(b)(3) permits "[a] loan to an employee stock ownership plan . . . if (A) such loan is primarily for the benefit of participants and beneficiaries of the plan, and (B) such loan is at an interest rate which is not in excess of a reasonable rate." The statute further provides that "[i]f the plan gives collateral to a party in interest for such loan, such collateral may consist only of qualifying employer securities (as defined in section 1107(d)(5) of this title)." *Id.* The exemptions allowing such loans "are defenses which must be proven by the defendant." *Pledger*, 240 F. Supp. 3d at 1336 (citations omitted). In an effort to prove that the exemptions applied to the 2011 Transaction, Defendants represent that (1) "the interest rate on TA's loan to the ESOP—

---

[4] To the extent that it is relevant, while Defendants contend that Plaintiffs solely argue that their claims under Count II "rest on the August 2011 compensation and stock award to Hogue and Thompson, and not the August 2011 loan agreements at issue," the Court notes that Plaintiffs actually argue that the transactions are interrelated as a part of the overall 2011 Refinance and point to Smith's deposition as evidence that the two transactions are "all part and parcel to one another." (Doc. 205 at 20–21 (emphasis omitted); *see* Doc. 201 at 38; Doc. 195-81 at 180:10–181:16).

16

1% over a 10-year term—was objectively and commercially reasonable"; (2) "the loan primarily benefitted participants by enabling the ESOP to shed the 10% interest rate and other onerous terms of the 2006 Seller Loans"; and (3) "TA, in the event of default, had no recourse against the ESOP other than recouping the amounts unpaid on the loan." (Doc. 195-1 at 22–23).

There is a genuine issue of material fact as to whether the loan primarily benefitted the parties and beneficiaries of the ESOP, as Plaintiffs' expert disagrees with Defendants' characterization of the result of the loan. Plaintiffs' expert Steven Sherman conducted an analysis and compared possible effects on the value of the company: (1) considering the 2011 Transaction, (2) not considering the 2011 Transaction, and (3) considering the 2011 Transaction without Equity Awards. (*See* Doc. 186-20 at 25). Sherman determined that "[t]he 2011 Transaction caused a significant outflow of cash that benefitted Hogue and Thompson to the detriment of the ESOP" and "the ESOP incurred an economic loss due to the 2011 Transaction that ranged between $8.2 million and $18.8 million without interest." (*Id.* at 30–31). Further, Sherman testified that the ESOP "would have been better off to do nothing" as "[t]hey were not forced to prepay the loan." (Doc. 185-6 at 83:18–19). Sherman also opined,

> [t]he idea, I believe, was to reduce the interest costs from 10 percent to a lower percentage, and that would create more cash flow for the company. But then based on the guarantee fee that Hogue and Thompson were paid, a combination of cash and issuance of significant shares, that there was really no net benefit to the ESOP of going through that whole process, so why do it? And even the terms around the guarantee fee, I've never seen anything quite like that of such scale. The cost of all that, I think, was documented to be about a million five, and the whole loan was only $8 million. That's like a 25 percent cost to pay them just to do the loan. So that in its own right makes no sense.

(*Id.* at 83:20–84:9).

As there is a genuine issue of material fact as to whether Defendants caused the ESOP to engage in transactions that they knew or should have known constituted improper transfers of ESOP assets to parties in interest, summary judgment is not appropriate.

17

### D.  Counts III and IV

Defendants first argue that Count III fails on its merits because "ERISA § 405(a)(3), by its terms, applies only to successor fiduciaries."[5] (Doc. 195-1 at 24). 29 U.S.C. § 1105(a)(3) actually provides that "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." While the court in *Fuller v. Suntrust Banks, Inc.* noted that "[m]ost courts to address the issue have applied Section 1105(a)(3) in the context of predecessor-successor fiduciaries[,]" this finding does not extend so far as to limit § 405(a)(3) to successor fiduciaries alone. 2019 WL 4804273, at *7. Similarly, the court in *Fernandez v. K-M Industries Holding Co., Inc.* held that a successor fiduciary "may potentially be liable under § 1105 for its failure to remedy the alleged breaches of fiduciary duty that took place before it was appointed the ESOP trustee," but *Fernandez* also does not stand for the proposition that § 405 applies only to successor fiduciaries. 585 F. Supp. 2d at 1184. Finally, while *Stephens v. US Airways Group* states that "a predecessor's breach that continues to have effect on beneficiaries during the term of a successor trustee must be remedied to the extent practicable under § 1105(a)(3)[,]" that holding does not stand for the proposition that § 405(a)(3) is limited to successor fiduciaries. 555 F. Supp. 2d at 119. Defendants point to, and the Court has reviewed, no case law that explicitly limits § 405(a)(3) to successor fiduciaries alone.

Defendants next argue that Count III fails on its merits because Urbach cannot be held liable "with respect to a breach of a fiduciary duty. . . if such breach was committed . . . after he ceased to be a fiduciary," in January 2012. (Doc. 195-1 at 24 (second omission in original) (emphasis omitted)). Paragraph 106 of the Amended Complaint states:

> As the Trustee for the 2011 Refinancing, Defendant Urbach had or would have had knowledge of ERISA violations by Defendants Hogue and Thompson, specifically that they had

---

[5]     In support of this argument, Defendants cite the following cases: *Fuller v. Suntrust Banks, Inc.*, No. 1:11-CV-784-ODE, 2019 WL 4804273, at *21 (N.D. Ga. July 16, 2019), *Fernandez v. K-M Industries Holding Co.,* 585 F. Supp. 2d 1177, 1184 (N.D. Cal. 2008), and *Stephens v. US Airways Group*, 555 F. Supp. 2d 112, 119 (D.D.C. 2008)). (*See* Doc. 195-1 at 24).

received consideration for their personal accounts in connection with the 2011 Refinancing. As Defendant Urbach did not take reasonable efforts to date to remedy these violations, Defendant Urbach is liable pursuant to ERISA § 405(a)(3), 29 [] U.S[.]C. [§] 1105(a)(3), along with any other person(s) who served as Trustee between August 23, 2011 and the present.

Neither the Amended Complaint nor Plaintiffs' Response to Defendants' Motion for Summary Judgment, appear to assert that Defendant Urbach is liable for actions taken after he ceased to be fiduciary. Rather, the Amended Complaint alleges that "Defendant Urbach breached his fiduciary duty when he approved the 2011 Refinancing based on his stated belief that it was in the best interests of the Company (as opposed to the best interests of the ESOP or its participants)" and further outlines additional alleged breaches that took place *during the 2011 Refinance*. (Doc. 30 ¶ 96). Likewise, in the Response, Plaintiffs argue that "in causing the 2011 Refinance, Urbach breached his fiduciary duties to the Plan[.]" (Doc. 201 at 40–41). Thus, to the extent that Defendants argue that Plaintiffs are alleging that Urbach is liable for actions taken after his resignation in January 2012, Plaintiffs do not appear to be making such an argument.

Furthermore, there is a genuine issue of material fact as to Defendant Urbach's co-fiduciary liability under § 405(a)(3). For example, the record contains evidence that Defendant Urbach was aware of Defendants Thompson and Hogue's alleged violations. For example, during his deposition, Defendant Urbach testified that he was engaged to "approv[e] of that in which the ESOP actually had to consent to the" Refinance and to "assist in negotiating and approving the restructuring of the employment agreements between the company and" Defendants Thompson and Hogue. (Doc. 195-79 at 47:5–13). Defendant Urbach further testified that he understood the employment agreements and the Refinance to be "two separate parts" but that "the only way [the Refinance] was going to get done was if [Defendants Thompson and Hogue] also had their restructuring done as part of it." (*Id.* at 47:14–24). Further, in his Declaration, Defendant Urbach also noted that he was "engaged [] as a special independent fiduciary to help [] determine whether the proposed restructuring of the compensation and equity of" Defendants Thompson and

19

Hogue "and the Company's proposed loan and line of credit through Atlantic Capital Bank" would be "financially fair to the ESOP." (Doc. 195-68 ¶ 3). In doing so, Defendant Urbach considered and reviewed extensive documents and information and "helped [Defendant] Kirbo negotiate the terms of the 2011 Executive Compensation Award with the Executives and their counsel[.]" (*Id.* ¶¶ 10, 14). As a part of this process, Defendant Urbach also "had multiple meetings and telephone calls" regarding the Refinance. (*Id.* ¶ 12; *see* Doc. 195-69). Defendants also admitted that "neither Defendant Urbach, Defendant Kirbo, nor any other trustee of the ESOP ever considered, threatened, or brought any lawsuit on behalf of the [Plan] against" Defendants Thompson or Hogue "for any reason." (Doc. 166-38 at 1). As such, a genuine issue of material fact exists as to whether Defendant Urbach can be held liable under § 405(a)(3).

Plaintiffs also allege Count III against the "Committee Defendants," which includes Kirbo, Hogue, and Thompson. (Doc. 201 at 41; *see* Doc. 30 ¶¶ 25, 93–107). Each of these Committee Defendants served as Trustee following the 2011 Refinance. (*See* Doc. 195-78 at 31:9–32:18; Doc. 195-77 at 65:6–21). In fact, Defendant Thompson testified during his deposition, that no one else "has been trustee of the ESOP since 2012 other than [him] and Mr. Hogue" aside from Kirbo, who was Trustee when the deposition was taken. (Doc. 195-78 at 32:12–18). Given the Committee Defendants' involvement in the 2011 Refinance as outlined above, there is a genuine issue of material fact as to the co-fiduciary liability of the Committee Defendants.

In Counts III and IV, Defendants also argue that various Defendants were not fiduciaries capable of being sued. With regard to Count III, Defendants argue that "the Committee members, in their individual capacities, were not ERISA fiduciaries," and thus "would not have had standing under ERISA § 502(a)(2) to bring an action on behalf of the Plan. Nor would the Committee or its members have had standing to file a shareholder derivative suit under state law." (Doc. 195-1 at 24–25 (emphasis omitted)). With regard to Count IV, Defendants argue that "none of the BOD members, in their individual capacities,

owed a fiduciary duty to anyone." [6] (*Id.* at 26). Defendants also state that "[o]nly the Trustee acting on behalf of the Trust, *i.e.* the legal owner of the ESOP's shares could have done so." (*Id.* at 25). But, "[a]n individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary." *Woods*, 396 F. Supp. 2d at 1364 (quoting *In re Polaroid Erisa Litig.*, 362 F. Supp. 2d 461, 472 (S.D.N.Y. 2005). The Committee members include Defendants Hogue, Thompson, and Kirbo, and each of them serve as fiduciaries individually by nature of their position in the company, participation on the Board of Directors, membership on the Administrative Committee—which serves as the Plan Administrator—and their respective service as Trustees. (Doc. 30 ¶ 15; Doc. 201 at 41). Furthermore, as members of the Board, each of the Committee Defendants had the authority to appoint a Trustee and a Plan administrator—a power that they exercised when they renewed Kirbo's position as Trustee and subsequently replaced Kirbo with Urbach as successor Trustee. (Doc. 195-22 at 2; *see* Doc. 195-33). Additionally, pursuant to Defendants' argument, each of the Committee Defendants has served as Trustee both during and since the 2011 Refinance. (*See* Doc. 195-78 at 31:9–32:18; Doc. 195-77 at 65:6–21).

Next, Defendants argue that "Plaintiffs would have to show that the Committee had actual knowledge that a violation of ERISA occurred, and that it then failed to take action within three years" in order "for liability to attach for failure to remedy an alleged breach under ERISA § 405(a)(3)[.]" (Doc. 195-1 at 25). Defendants make the same argument about the Board of Directors. (Doc. 195-1 at 26). Count III alleges breach of fiduciary duty pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and co-fiduciary liability pursuant to ERISA § 405, 29 U.S.C. § 1105. (Doc. 30 ¶¶ 93–107). Count IV alleges breach of duty to monitor pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B). (*Id.* ¶¶ 108–113). Plaintiffs argue that co-fiduciary liability under ERISA § 405(a)(2) does not require a showing of actual knowledge, and that ERISA §

---

[6]    Count IV is alleged against the "Director Defendants," which includes Defendants Hogue, Kirbo, Hall, and Thompson. (Doc. 30 ¶¶ 16, 108–113).

405(a)(3) only requires knowledge "of the circumstances and facts giving rise to the breach[,]" rather than actual knowledge. (Doc. 201 at 42).

As stated above, the text of § 405(a)(3) imputes liability on a successor fiduciary "if he has *knowledge* of a breach by such other fiduciary[.]" 29 U.S.C. § 1105(a)(3) (emphasis added). The Supreme Court held in *Intel Corp. Investment Policy Committee v. Sulyma* that actual knowledge is only required when ERISA uses that specific phrase as "[t]he addition of 'actual' . . . signals that the plaintiff's knowledge must be more than 'potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal.'" 140 S.Ct. 768, 776–77 (2020). Plaintiffs have offered evidence that each of the named Defendants—Defendants Urbach, Hogue, Thompson, and Kirbo, were each personally involved in multiple aspects of the 2011 Transactions. Defendant Kirbo served as the Trustee and engaged in negotiations regarding compensation for Defendants Hogue and Thompson. (*See* Docs. 195-22; Doc. 165-1). Defendants Kirbo, Thompson, and Hogue engaged in extensive discussions regarding the new compensation, including Defendant Kirbo sending Defendants Thompson and Hogue a confidential draft of a letter discussing the executives' compensation and disclosing internal Board conversation regarding their compensation when they claim to have abstained. (*See* Doc. 195-76 at 120:1–12, 104:23–106:4; Doc. 165-1 at 2; Doc. 166-27 at 2–4). Defendants Hogue and Thompson each received new employment agreements which included new stock options and a "guarantee fee" for their "facilitation of the new bank financing and entering into personal guarantee of the same" in relation to the 2011 Refinance. (Doc. 195-51 at 5; Doc. 195-52 at 5; *see* Doc. 195-47). Defendant Urbach replaced Defendant Kirbo as Trustee and facilitated the remainder of the 2011 Refinance. (*See* Doc. 195-26). Moreover, Defendants Kirbo, Hogue, and Thompson served as members of the Board of Directors and members of the Administrative Committee, which served as the Plan Administrator. (Doc. 195-35 at 8; Doc. 195-2 ¶ 6; Doc. 195-3 ¶¶ 20, 24; Doc. 195-6 § 1.4). Despite this, the Committee "never considered, threatened, or brought any lawsuit on behalf of the [Plan] against" Defendants Thompson and Hogue "for any reason." (Doc. 166-38 at 3). Such involvement with the transactions at issue creates a genuine issue of material fact as to whether

Defendants Urbach, Thompson, Hogue, and Kirbo had the requisite knowledge of the alleged breach.

As to the Board of Directors' knowledge of the prohibited transaction, Count IV alleges a violation of ERISA § 404(a)(1)(A) and (B) against the "Director Defendants," which includes Defendants Hogue, Kirbo, Hall, and Thompson. (Doc. 30 ¶¶ 16, 108–113; Doc. 195-1 at 26). Thus, the knowledge requirement is not the same. "A person with discretionary authority to appoint, maintain, and remove plan fiduciaries is himself deemed a fiduciary with respect to the exercise of that authority. Implicit in the fiduciary duties attaching to persons empowered to appoint and remove plan fiduciaries [is] the duty to monitor appointees." *Fleming v. Rollins, Inc.*, No. 1:21-CV-05343-ELR, 2023 WL 2170815, at *7 (N.D. Ga. Jan. 30, 2023) (quoting *Woods*, 396 F. Supp. 2d at 1371). "A plaintiff states a claim for breach of the duty to monitor by alleging that an appointing fiduciary '*knew or should have known*' of underlying breaches and that 'such knowledge should have triggered an investigation to determine whether [other] fiduciaries were administering the Plan in accordance with ERISA and the terms of the Plan.'" *Gamache*, 446 F. Supp. 3d at 1328 (quoting *Perez v. Geopharma, Inc.*, 2014 WL 3721369, at *4 (M.D. Fla. July 25, 2014)) (emphasis added) (alteration in original). Here, the Board voted and approved the transactions at issue. (*See* Doc. 142-41; *see also* Doc. 142-44). Additionally, each of the Defendants was a party to the transaction and was extensively involved, as explained above.

Accordingly, as there is a genuine issue of material fact as to whether the Committee Defendants, Defendant Urbach, and the Board of Director Defendants had the requisite knowledge, summary judgment is not appropriate as to Counts III and IV.

## II.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for partial summary judgment on three grounds: (1) "Defendants Hogue and Thompson engaged in a prohibited transaction in violation of ERISA § 406(b)(3)"; (2) "Defendants Hogue and Thompson's ERISA § 408(b)(3) exemption defense fails as a matter of law as to Plaintiffs' ERISA § 406(b)(3) claim"; and (3) "[a]ll Defendants' 'affirmative defenses' other than their exemption and statute of repose

23

defenses fail as a matter of law because they are not affirmative defenses." (Doc. 196-1 at 2).

### A. Prohibited Transaction

Plaintiffs' 406(b)(3) claim turns on whether Defendants Thompson and Hogue were acting in their fiduciary capacity. ERISA § 406(b)(3) provides that "[a] *fiduciary* with respect to a plan shall not . . . receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106 (b)(3) (emphasis added). Plaintiffs acknowledge that "there is at least a material issue of disputed fact that Hogue and Thompson acted as fiduciaries in connection with the 2011 Refinance because Hogue and Thompson continued to exercise comprehensive *de facto* authority and control with respect to the Plan notwithstanding their abstentions from these Board votes." (Doc. 196-1 at 19 n.1). Contrary to Plaintiffs' assertion, the existence of a genuine issue of material fact as to the fiduciary element of the 406(b)(3) claim precludes summary judgment on this claim.

### B. ERISA § 408(b)(3) Exemption Defense

Plaintiffs also seek summary judgment as to Defendants' assertion that the Transaction at issue is exempt pursuant to ERISA § 408(b)(3). (Doc. 196-1 at 25–27). Plaintiff argues that pursuant to 29 C.F.R. § 2550.408b-3(b)(1), ERISA § 408(b)(3) does not provide an exemption for transactions conducted in violation of ERISA § 406(b)(3). (*Id.* at 27). Defendants argue that "Plaintiffs create a red herring in arguing that [] ERISA § 408(b)(3), which authorized TA's loan to the ESOP, does not apply to alleged violations of ERISA § 406(b)(3)." (Doc. 198 at 20). Contrary to Defendants' argument, however, the statute provides an explanation regarding the statutory exemptions and clearly states that "[s]ection 408(b)(3) does not provide an exemption from the prohibitions of section 406(b)(3) of the Act (relating to fiduciaries receiving consideration for their own personal account from any party dealing with a plan in connection with a transaction involving the income or assets of the plan." 29 C.F.R. § 2550.408b-3(b)(1). Defendants' thirty-second defense merely states "Plaintiff's claims fail, in whole or in part, because the challenged acts and or transactions are exempt under ERISA § 408, 29 U.S.C. § 1108." (Doc. 44 at 7).

24

The statutory language also provides, however, that "Section 408(b)(3) of the Act provides an exemption from the prohibited transaction provisions of sections 406(a) and 406(b)(1)[,]" both of which Plaintiff use to bring the present action. 29 C.F.R. § 2550.408b-3(b)(1). Thus, solely to the extent Defendants seek to assert the ERISA § 408(b)(3) exemption defense to a prohibited transaction pursuant to ERISA § 406(b)(3), such defense fails as a matter of law and Plaintiffs are entitled to summary judgment on this issue.

### C. Affirmative Defenses

Finally, Plaintiffs argue that "[a]ll Defendants' 'affirmative defenses' other than their exemption and statute of repose defenses fail as a matter of law because they are not affirmative defenses." (Doc. 196-1 at 27). Defendants argue that Plaintiffs' Motion on this issue is an untimely Motion to Strike, and thus should be denied. (Doc. 198 at 24).[7] The Court, however, will consider Plaintiff's arguments, as "[p]artial summary judgment may properly be granted on affirmative defenses." *Turner v. Buckhead Beef Co.*, No. 1:10-CV-2797-HLM-WEJ, 2011 WL 13319458, at *17 n.55 (N.D. Ga. Sept. 20, 2011) (citing *Tingley Sys., Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209, 1218 (M.D. Fla. 2007)).

As a general matter, "[a]n affirmative defense does not identify a defect in a plaintiff's *prima facie* case." *F.D.I.C. v. Stovall*, No. 2:14-cv-00029-WCO, 2014 WL 8251465, at *2 (N.D. Ga. Oct. 2, 2014) (emphasis omitted); *see also In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."). "Instead, an affirmative defense is something that, if proven, will reduce or eliminate a plaintiff's recovery even if the plaintiff established a *prima facie* case." *Stovall*, 2014 WL 8251465, at *2 (citing *Roberge v. Hannah Marine Corp.*, 124 F.3d 199, 199 (6th Cir. 1997) ("An affirmative defense . . . does not negate elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven.")). Specifically, "[a]n affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters." *VP Props. &*

---

[7]    A complete list of Defendants' asserted defenses can be found in Doc. 44 of the record.

*Devs., LLP v. Seneca Specialty Ins. Co.*, 645 F. App'x. 912, 916 (11th Cir. 2016) (quoting *Royal Palm Sav. Ass'n v. Pine Trace Corp.*, 716 F. Supp. 1416, 1420 (M.D. Fla. 1989) (alteration in original) (other citation omitted).

### i.    Seventh, Twenty-Third, Thirty-Second, Thirty-Ninth, and Fortieth Defenses

In their Response to Plaintiffs' Motion for Partial Summary Judgment, Defendants' withdrew their Twenty-Third, Thirty-Ninth, and Fortieth Defenses. (Doc. 198 at 25 n.11). Plaintiffs do not seek summary judgment as to Defendants' Seventh Defense and the Court has previously addressed the Thirty-Second Affirmative Defense. (Doc. 196-1 at 28).

### ii.    Fifth, Tenth, Fourteenth, and Thirty-Fourth Defenses

Plaintiffs argue that Defendants' Fifth Defense arguing that state law governs the present case is an issue of subject matter jurisdiction, and thus can be raised at any time and is not an affirmative defense. (Doc. 196-1 at 28). Plaintiffs further argue that Defendants' Fourteenth and Thirty-Fourth Defenses "challenge elements of Count III for breach of fiduciary duties under § 404(a)" and are thus not affirmative defenses. (*Id.* at 29). Defendants argue that the Fifth, Fourteenth, and Thirty-Fourth Affirmative Defenses all "raise factual questions as to whether this Court has jurisdiction over Plaintiffs' claims, and, thus, are proper under Fed. R. Civ. P. 12(b)(1)." (Doc. 198 at 26). "The defense of [lack of subject matter] is, however, specifically identified under [Federal Rule of Civil Procedure 12(b)(1)] which may be raised in either the responsive pleading or by motion." *Luxottica Group, S.p.A. v. Airport Mini Mall, LLC*, 186 F. Supp. 3d 1370, 1375 (N.D. Ga. 2016). "Where the defense is merely raised in the responsive pleading it is typically ignored as a harmless nullity unless and until the defendant has, by motion, provided facts and/or legal authority to support the defense." *Id.* (citation omitted). The assertion or striking of these defenses "at this stage of these proceedings is immaterial because the Court has already determined that" it has subject matter jurisdiction over this case. *Id.* at 1375; *see Gamache*, 446 F. Supp. 3d at 1324–25. The Court similarly declines to address the Tenth defense, as it has also previously been rejected. *Gamache*, 446 F.Supp.3d at 1326–27.

### iii.    Remaining Defenses

As to the remaining defenses, Plaintiffs argue that they "challenge Plaintiffs' prima facie case and do not raise extraneous matters[,]" and thus are not affirmative defenses. (Doc. 196-1 at 28). Plaintiffs argue that the Second, Eleventh, Twelfth, and Thirteenth defenses "challenge purported elements of Count I for prohibited transaction under ERISA §§ 406(b)(1) and (3) [] and thus are not affirmative defenses." (*Id.* at 29). Plaintiffs similarly argue that the First, Second, Third, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Twenty-Ninth, Thirty-First, and Thirty-Fifth defenses "challenge elements of Count II for prohibited transaction under § 406(a)(1)(d)" and are equally not affirmative defenses. (*Id.*). Plaintiffs make the same argument with regard to the Fourth, Sixth, Eighth, Fourteenth, Nineteenth, Twentieth, Twenty-First, Twenty-Second, Twenty-Fourth, Thirtieth, Thirty-Third, Thirty-Fourth, Thirty-Sixth, and Thirty-Seventh defenses as they "challenge elements of Count III for breach of fiduciary duties under § 404(a)." (*Id.*). Finally, Plaintiff argues that the Ninth, Twenty-Fifth, Twenty-Sixth, Twenty-Seventh, Twenty-Eighth, and Thirty-Eighth defenses "challenge Plaintiffs' contention that Defendants affirmatively concealed their breaches and violations" and "challenges Plaintiffs' claim for attorneys' fees" and as such, "are not affirmative defenses and fail as a matter of law." (*Id.*).

In their response, Defendants admit that the First, Second, Eleventh, Twelfth, Thirteenth, Fifteenth, Seventeenth, and Thirty-Fifth defenses "raise issues of fact" about "whether plan assets were involved, and/or whether the two transactions were separate for purposes of determining who was a party to them." (Doc. 198 at 25). Defendants further admit that the Third, Fourth, Eighth, Ninth, Thirteenth, Fifteenth, Sixteenth, Eighteenth, Twentieth, Twenty-First, Twenty-Fifth, Twenty-Sixth, Twenty-Seventh, Twenty-Eighth, Twenty-Ninth, Thirtieth, Thirty-First, Thirty-Third, and Thirty-Seventh defenses "raise factual issues" about (1) whether "TA was an operating company for purposes of ERISA's Plan Asset Rule"; (2) whether "the transactions diluted the value as opposed to the ESOP's equity interest in TA's stock"; (3) whether "the fact the Executives and Urbach did not vote on the transactions divested them of alleged fiduciary status that Plaintiffs allege attached"; (4) whether "the Defendants' actions divested them of party-in-interest status under

27

ERISA"; (5) whether "Urbach sat on both sides of the same table for purposes of the transactions"; (6) whether "TA's corporate documents vitiated the fiduciary status of Defendants"; (7) whether "the fact that the nondisclosed information was either not public or not material vitiated a duty to disclose"; and (8) whether "the fact that Defendants' lack of knowledge of the alleged prohibited transactions precluded their ability knowingly to facilitate the transactions per ERISA § 405(a)." (Doc. 198 at 25–26). Defendants also admit that the remaining unaddressed defenses, the Sixth, Nineteenth, Twenty-Second, Twenty-Fourth, Thirty-Sixth, and Thirty-Eighth defenses, "raise factual issues which would negate Plaintiffs' *prima facie* case" and request that the Court "treat any [] defense" it considers a negative averment "as a specific denial and put Plaintiffs to their proof." (*Id.* at 27).

First, the Court notes that, in Defendants' Answer, none of the defenses are labeled "affirmative." (*See* Doc. 44 at 1–8). "[B]ecause no defenses are labeled 'affirmative,' it is unnecessary for the Court to re-characterize any defenses as specific denials." *Anderson v. Brown Indus.*, No. 4:11-CV-00225-HLM-WEJ, 2012 WL 12860567, at *4 (N.D. Ga. May 17, 2012). Nonetheless, the Court agrees with Defendants that each of the remaining claims raise factual issues regarding Plaintiffs' Complaint. "Where a party labels a specific denial as a defense in its pleadings, courts will generally treat the defense as a denial." *F.D.I.C. v. Bristol Home Mortg. Lending, LLC*, No. 08-81536-CIV, 2009 WL 2488302, at *3 (S.D. Fla. Aug. 13, 2009). In treating mislabeled defenses as denials, Courts generally have declined to strike or enter judgment on these defenses. *See Vann v. Inst. of Nuclear Power Operations, Inc.*, No. 1:09-CV-1169-CC-LTW, 2011 WL 13272741, at *7 (N.D. Ga. Oct. 6, 2011) (declining to grant judgment in Plaintiff's favor after construing "'affirmative defenses' simply as defenses or specific denials'") (collecting cases). The Court similarly declines to enter summary judgment on these specific denials here. Plaintiffs largely makes conclusory statements as to each of these defenses and provide no citations to the record that would demonstrate that each of these denials lack a genuine issue of material fact. (*See generally* Doc. 196-1 at 27–29). As such, Plaintiffs have failed to meet their burden on summary judgment.

28

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. 195) is **DENIED**. Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** as to the assertion of ERISA §408(b)(3) exemption defense to a violation of ERISA § 406(b)(3). The remainder of Plaintiffs' Motion is **DENIED**.

**SO ORDERED**, this 29th day of September, 2023.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, JUDGE**
**UNITED STATES DISTRICT COURT**