IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| NELSON GAMACHE, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO.: 1:19-CV-21 (LAG) |
| | : | |
| JOHN F. HOGUE, Jr., *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER

This case is before the Court for findings of fact and conclusions of law following a bench trial. After review of the evidence and briefing submitted for trial, the Court enters judgment in favor of Defendants on Counts I–IV.

## BACKGROUND

On January 29, 2019, Plaintiffs Nelson Gamache and Edward Nofi initiated this class action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*., against Defendants John F. Hogue, Jr., Graham Thompson, James Urbach, Glenn Kirbo, Randy Hall[1], John Does 1–20, and the Administrative Committee of the Technical Associates of Georgia, Inc. Employee Stock Ownership Plan. (Doc. 1). Plaintiffs amended their Complaint on April 19, 2019. (Doc. 30). Plaintiffs, former employees of Technical Associates of Georgia, Inc. (TAG) and participants in the TAG Employee Stock Ownership Plan (ESOP), allege that Defendants engaged in prohibited transactions and breached fiduciary duties in violation of 29 U.S.C. §§ 1104(a)(1), 1105, 1106(a)(1)(D), and 1106(b). (*Id.* at 4, 26–33). The Amended Complaint contains four counts, all of which were considered at trial:

---

[1]    Randy Hall was a Defendant to this action, but he passed away on November 4, 2021. (Doc. 177 at 2). The Court granted Plaintiffs' Motion for Substitution of Proper Party on September 8, 2022. (*Id.*; Doc. 192). Defendant Jeanne C. Hall, Randy Hall's wife, was substituted for Defendant Randy Hall.

- Prohibited Transactions in Violation of ERISA § 406(b)(1) & (3), 29 U.S.C. § 1106(b)(1) & (3) Against Defendants Hogue and Thompson alleging that, as members of the TAG Board and ESOP Administrative Committee, Defendants Hogue and Thompson engaged in prohibited plan-fiduciary transactions by dealing with ESOP assets in their own interest and by receiving consideration for their personal accounts in connection with a transaction involving ESOP assets, in violation of 29 U.S.C. § 1106(b)(1) & (3) (Count I), (*id.* ¶¶ 80–86);

- Prohibited Transactions in Violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) Against Defendants Urbach, Hogue and Thompson alleging that as ESOP trustee, Defendant Urbach caused the ESOP to engage in transactions that he knew or should have known constituted transfers of ESOP assets to parties-in-interest (Defendants Hogue and Thompson) and that Defendants Hogue and Thompson knowingly participated in those transactions, in violation of 29 U.S.C. § 1106(a)(1)(D) (Count II), (*id.* ¶¶ 87–92);

- Breach of Fiduciary Duty Pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B) And Co-Fiduciary Liability Pursuant to ERISA § 405, 29 U.S.C. § 1105 Against Defendant Urbach and the Committee Defendants alleging that Defendant Urbach breached his fiduciary duties under 29 U.S.C. § 1104(a)(1) by approving the 2011 Refinancing, and that he and the ESOP Administrative Committee (Defendants Hogue, Thompson, and Kirbo) breached their duties under 29 U.S.C. §§ 1104(a)(1)(A) and (B) and 1105(a)(2) and (3) by failing to remedy the prohibited transactions alleged in Counts I and II (Count III), (*id.* ¶¶ 93–107); and

- Breach of Duty to Monitor Pursuant to ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B) Against the Director Defendants alleging that the members of the TAG Board (Defendants Hogue, Thompson, Kirbo, and Hall) breached their duties under § 1104(a)(1)(A) and (B) by failing to monitor or take appropriate action against Defendants Urbach, Hogue, and Thompson (Count IV), (*id.* ¶¶ 108–13).

The Court held a bench trial on July 29–August 2, 2024. (Docs. 265–69). Having reviewed the evidence and briefs in their entirety, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In 1980, Randall Wages (Wages) and Stephen Harrison (Harrison) founded TAG, a closely-held, private operating company that supplies staffing services, engineering services, and technical services to owners of industrial manufacturing facilities throughout the United States. (Doc. 242-3 ¶ 1) [2]. TAG is headquartered in Albany, Georgia. (*Id.* ¶ 2). In or around late 2005 or early 2006, Wages and Harrison announced their intention to leave TAG. (*Id.* ¶ 3). In 2006, TAG established (1) an ESOP, and (2) an Employee Stock Ownership Trust (Trust) to hold the ESOP assets. (*Id.* ¶¶ 4–5). On May 23, 2006, TAG's Board of Directors (Board) appointed Defendant Glenn Kirbo (Kirbo) as Trustee of the ESOP. (*Id.* ¶ 6).

On August 16, 2006, the ESOP purchased 100,000 shares of TAG from Wages and Harrison for $17.5 million (the 2006 ESOP Purchase). (*Id.* ¶ 7). The 2006 ESOP Purchase was financed using $1.5 million in cash contributions from TAG and $16 million in promissory notes from the Trust to Wages and Harrison with interest rates of at least 10% (the 2006 Seller Loans). (*Id.*). The 2006 ESOP Purchase, among other things, (a) mandated that, until the notes on the 2006 Seller Loans were paid, TAG, annually, had to contribute all of its net profits to the ESOP to be used to accelerate the repayment of the 2006 Seller Loans; (b) required payment of up to $5 million of additional consideration to Wages and Harrison based on TAG's achievement of certain financial performance metrics after the closing date; (c) provided Wages and Harrison with additional consideration in the form of warrants to purchase outside of the ESOP, in the aggregate, up to 6% of "the Fully Diluted Shares of Common Stock issued and outstanding at the time of the exercise of the warrant"; (d) required the ESOP to pledge the stock it purchased to Wages and Harrison as collateral for the loan; and (e) authorized Wages and Harrison, in the event the ESOP defaulted in

---

[2]    Doc. 242-3 is the Parties' Stipulated Facts, which were filed before trial and cited by the Parties in their post-trial briefing. (Doc. 242-3).

the payment of the 2006 Seller Loans, to reconstitute the Board so as to exercise majority control over TAG. (*Id.* ¶ 8). TAG is, and has always been, the Plan Sponsor of the ESOP within the meaning of ERISA § 3(16). (*Id.* ¶ 11). At the time of the 2006 ESOP Purchase, Wages and Harrison were on the Board. (*Id.* ¶ 12). Defendants John F. Hogue, Jr. (Hogue) and Graham Thompson (Thompson) were not on the Board and did not negotiate any terms of that transaction or vote to approve any of its terms. (*Id.* ¶ 13). Defendants Hogue and Thompson became members of the Board after the 2006 ESOP Purchase closed. (*Id.* ¶ 14).

Additionally, TAG implemented a Stock Incentive Plan (the 2006 Stock Incentive Plan) in August 2006. (*Id.* ¶ 9). Under the 2006 Stock Incentive Plan, an additional 20,000 shares of TAG were set aside for the purposes of attracting and retaining key executives. (*Id.*). On August 16, 2006, pursuant to the plan, Defendant Hogue and Defendant Thompson were each provided 6,000 shares of TAG stock outside of the ESOP. (*Id.*). Two thousand of those additional shares were in the form of time-vesting stock options, and 2,000 were the form of performance-based stock options. (*Id.*).

In late 2009 or early 2010, TAG began having discussions with banks about refinancing the 2006 Seller Loans. (*Id.* ¶ 15). On April 21, 2011, TAG engaged Defendant James Urbach (Urbach) as a special independent fiduciary. (*Id.* ¶ 16). On or around April 25, 2011, Defendant Urbach retained Willamette Management Associates (Willamette) as a financial advisor. (*Id.* ¶ 17). In late May 2011, Defendant Kirbo asked Willamette to review the latest term sheet for the anticipated refinance that was proposed by Defendants Hogue and Thompson and their attorney. (*Id.* ¶ 18). On June 22, 2011, Defendant Kirbo resigned as Trustee of the ESOP. (*Id.* ¶ 19). Effective June 22, 2011, Defendant Randy Hall (Hall) was appointed to the Board. (*Id.* ¶ 20). From June 22, 2011 through August 22, 2011, the Board consisted of Wages, and Defendants Hall, Hogue, Kirbo, and Thompson. (*Id.* ¶ 21). On June 22, 2011, the Board appointed Defendant Urbach to serve as Trustee. (*Id.* ¶ 22). On August 16, 2011, Defendant Urbach and Randy Smith (Smith), then-counsel to the Trustee, attended a presentation by Willamette analysts Michael Hartman and Michael McGinley. (*Id.* ¶ 23). As part of the Willamette engagement, Willamette was to "value the stock of [TAG] assuming a closing of the Transactions versus a value of the stock without

4

the completion of the Transactions." (P025[3] at 2). During the presentation, Willamette's analysts opined that, based on Willamette's analyses, the terms and conditions of the 2011 Refinance were "fair to the ESOP from a financial point of view." (D0042 at 5; *see* P337 at 3). The presentation included a document titled, "December 31, 2010 TAG Valuation Opinion Summary." (D0042 at 62). Later, Willamette provided Defendant Urbach with a letter, again stating that the 2011 Refinancing was fair to the ESOP "from a financial point of view[.]" (J228 at 1). The letter did not include any written financial analysis or specific analysis of the potential dilutive effect of the refinancing on the value of the ESOP's shares. (*See generally id.*). Mike McGinley, one of the Willamette analysts who gave the August 16, 2011 presentation, testified that he recalled "performing an analysis of whether the dilution of ESOP shared would be fair to the ESOP from a financial point of view[.]" (J502 at 118:17–22; *see id.* at 91–92, 108–110). McGinley remembers evaluating the 2011 Refinancing "as a whole[,]" and testified that Willamette's conclusion was that "the value with the transactions was better than without." (*Id.* at 124:21–22, 107:25–108:22). Defendant Urbach also testified that he spoke with McGinley about "all sorts of valuation impacts." (P1005 at 69:18–23). Defendant Urbach testified that "the fairness opinion delivered by Willamette was around the idea that this transaction was fair to the ESOP from a financial point of view, which meant that it was not dilutive of value to the shareholders." (*Id.* at 98:19–99:1).

On August 18, 2011, the Board voted to approve acceptance of the refinance loan from Atlantic Capital Bank (the 2011 Refinance). (Doc. 242-3 ¶ 24). Wages, Defendant Hogue, and Defendant Thompson abstained from the Board's vote. (*Id.*). As a condition of the 2011 Refinance, Defendants Hogue and Thompson's compensation was to be restructured, so the two entered into new employment agreements. (*Id.* ¶ 25; J098; J099; *see* J501 at 96; *see also* D0264 at 2). On August 22, 2011, the Board voted to approve the new employment agreements. (Doc. 242-3 ¶ 25). Defendants Hogue and Thompson also abstained from that vote. (*Id.*).

---

[3]    The Court cites to the exhibit numbers as admitted during trial.

Wages resigned from the Board prior to the vote. (*Id.*). From August 22, 2011 through November 24, 2021, TAG's Board consisted of Defendants Hall, Hogue, Kirbo, and Thompson. (*Id.* ¶ 26). Plaintiff Gamache was employed by TAG from 2001 to 2018 and is a participant in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). (*Id.* ¶ 27). Plaintiff Nofi was employed by TAG from 1986 to 2013 and is a participant in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). (*Id.* ¶ 28). As of December 31, 2006 (which is the end of the Plan Year), the TAG ESOP had 199 participants. (*Id.* ¶ 29). As of December 31, 2011 (which is the end of the Plan Year), the TAG ESOP had 380 participants. (*Id.* ¶ 30). As of December 31, 2022 (which is the end of the Plan Year), the TAG ESOP had 344 participants. (*Id.* ¶ 31).

Both Named Plaintiffs were aware of the 2011 Refinance in 2011, and Plaintiff Gamache knew that Defendants Hogue and Thompson held stock outside of the ESOP by early 2015. The Named Plaintiffs assert that Defendants failed to disclose the change in TAG's ownership resulting from the 2011 Refinance and that Defendant's Hogue and Thompson owned stock outside of the ESOP. Plaintiff Gamache alleges that, in 2011, he "received the company-wide notice" that TAG "was changing banks" and that "the ESOP debt to []Wages and []Harrison was being paid off." (P1007 ¶ 28). Plaintiff Gamache further asserts that there wasn't "any other company-wide or ESOP-wide communication about the 2011 refinance." (*Id.*). Plaintiff Gamache testified that he learned from Defendant Thompson in the Fall of 2016 that "[Defendant Thompson] and [Defendant Hogue] had bought the company during the refinancing" and that "[Defendant Thompson] and [Defendant] Hogue owned part of the company outside of the ESOP[.]" (Doc. 273 at 494:21–495:14, 495:20–496:1). During Plaintiff Gamache's testimony during the trial, the Court observed Plaintiff Gamache's demeanor and attempts to avoid giving direct answers.[4] When considered alongside contradictory documentary and testimonial evidence

---

[4]     "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Thelisma*, 615 F. App'x 664, 665 (11th Cir. 2015) (per curiam) (citation omitted). Here, "[i]t is the district court's role, as factfinder, to evaluate the credibility of witnesses." *United States v. Montes*, 523 F. App'x 634, 635 (11th Cir. 2013) (per curiam) (citation omitted).

presented during the trial, the Court does not find Plaintiff Gamache's testimony to be credible regarding when he gained knowledge of the refinance or that Defendants Thompson and Hogue owned stock outside of the ESOP. As discussed below, the credible evidence establishes that, while Plaintiff Gamache may not have known all of the details of the transaction, he was aware of the 2011 Refinance and that it had resulted in Defendants Thompson and Hogue owning stock outside of the ESOP by early 2015, at the latest.

Plaintiff Nofi, who retired from TAG in 2013, learned of the 2011 Refinancing "during a 2011 staff meeting with [Defendant] Thompson[.]" (P1001 ¶ 2; Doc. 272 at 55:10–12). While his recollection of what occurred during the meeting is vague, he states that Defendant Thompson did not disclose that he and Defendant Hogue had received stock outside of the ESOP as part of the refinance. (P1001 ¶ 5). Plaintiff Nofi became aware that the two had obtained stock outside of the ESOP when Plaintiff Gamache advised him of the fact in 2018. (Doc. 272 at 55:6–12; Doc. 309 ¶ 316; Doc. 310 ¶ 317; P1001 ¶ 8). Plaintiff Nofi's shares of the ESOP were worth approximately $100,000 when he retired, and he was paid their full value by 2018. (P1001 ¶ 7; Doc. 272 at 54:1–55:5). Plaintiff Nofi never asked Defendant Hogue or Thompson about the 2011 Refinancing or their ownership of stock outside the ESOP following the 2011 Refinancing. (Doc. 272 at 55:13–18, 56:19–21).

Defendant Hogue sent an email generally advising all TAG employes of the 2011 Refinance on April 16, 2011. (Doc. 273 at 322:22–25, 323:8–11, 421:2–21). That email read:

> All –
>
> This email is to inform everyone that our company will be finalizing an agreement with Atlantic Capital Bank (ACB) to refinance the remaining balance of our ESOP loan which will also create a new banking relationship with this institution.
>
> This has been in the works for months and will be of great benefit to the company as we will have much improved finance terms, taking advantage of historically low interest rates. The

ESOP balance and term will be moved over and the process will continue as it does today with the remaining stock released over the same term it would have been if we continued under our current agreement with our previous owners. The remaining 5 years on the note and the principal balance (as well as the company's credit facility) will now be held by Atlantic Capital and of course, our interests remain the same……to remove this debt from our organization as quickly as possible freeing up the stock to the participants in an accelerated fashion, but no later than what we currently have in place further enabling our company to invest in itself and its people for future growth while achieving the goal of greater returns to our employee shareholders.

You may recall, the original ESOP was based on 10 years (beginning in 2006), yet we have released over 75 percent of the stock in 5 years (year ending 2010). A great result for all involved.

The new finance terms will help our business cash flow and save the company, and the ESOP, a lot of interest dollars during the remaining years. We are extremely pleased to be able to refinance this balance and given the economic times we are in, and the difficulties the banking industry has seen, this is a major accomplishment. Without a doubt, the primary reason we are in the position to receive these attractive terms in such a turbulent time, is the great success and growth we have seen over the last few years of operation. A testimony to the kind of company TA[G] has become and the kind of people that make the company what it is.

As we make this transition, we are working diligently to ensure there are no snags in regards to paychecks, expense checks, AR, and AP. You will soon see your checks coming from Atlantic Capital Bank. If you are using direct deposit, then this transition will be seamless to you. In fact, this entire transaction should be seamless and obviously we will do all we can do to ensure there are no issues to contend with. On the outside chance there is any issue at all, please contact Rachael Brock at 1-800-356-3240 x215 immediately and we will address the issue right away.

> This banking agreement will be finalized next week and again, should be seamless to our organization and to you personally.
>
> As always, we thank you for your continued support of Technical Associates.
>
> Thank you,
>
> John Hogue                          Graham Thompson
> President of Operations             President of Engineering

(P294). The August 16, 2011 email does not advise employees that the percentage of TAG that the ESOP was going to own was going to change as the result of the refinance; nor was there any "written document . . . distributed to all ESOP participants" that disclosed Defendant Hogue's or Defendant Thompson's "actual or potential benefit" from the 2011 Refinance. (Doc. 273 at 323:17–25).

In late 2014 or early 2015, Defendant Thompson held a series of meetings with TAG employees in Albany and answered questions about the ESOP and the 2011 Refinance. James Sharp (Sharp), a mechanical engineer at TAG and ESOP participant, attended some of the meetings during which Defendant Thompson spoke about the ESOP and answered "any questions about the ESOP that the employees raised[.]" (Doc. 275 at 912:21–913:4, 915:2–18). Sharp recalled Defendant Thompson "dr[awing] piecharts on the board explaining . . . how the ESOP was broken up[,]" and that the piechart Defendant Thompson drew showed "that he had shares and that [Defendant] Hogue had shares outside the ESOP[.]" (*Id.* at 916:7–14). Sharp confirmed that "[Defendant] Thompson [was] open about his ownership and shares outside [of] the ESOP at that meeting[.]" (*Id.* at 917:7–9). When Sharp stepped away from that meeting, it was his understanding that Defendants Hogue and Thompson owned shares outside the ESOP. (*Id.* at 917:15–18). Specifically, Sharp understood that there had been a refinancing around 2011 and that, as a result, the ESOP shares went to sixty percent. (*Id.* at 918:18–23). Stephen Knuckles (Knuckles), an ESOP participant, also attended the 2014/2015 meeting during which Defendant Thompson drew on a whiteboard during a discussion about TAG ownership. (Doc. 276 at 977:8–25). Knuckles remembers "40" being written next to the ownership of Defendants

Thompson and Hogue on the whiteboard. (*Id.* at 978:18–20). While Plaintiff Gamache testified that he was not at the 2015 meeting where Defendant Thompson diagrammed the breakdown of the ESOP ownership on the whiteboard, both Sharp and Knuckles remember Plaintiff Gamache being present at that meeting. (*Id.* at 978:21–23; Doc. 275 at 916:25–917:1). As Plaintiff Nofi had retired in 2013, he did not attend any of these meetings. (*See* P1001 ¶ 2).

Generally, while TAG employees did not know all of the details of the 2011 Refinance, they were aware that Defendants Hogue and Thompson held stock outside of the ESOP prior to 2016. (Doc. 273 at 366:17–367:1). Jason Irvin (Irvin), the business manager for TAG, learned that Defendants Hogue and Thompson "had received additional shares and equity in connection with their 2011 employment agreements" in "[l]ate 2011, early 2012." (Doc. 275 at 841:2–9, 851:5–7). Neither Defendant Hogue nor Defendant Thompson ever told Irvin "to keep information related to their stock ownership confidential[.]" (*Id.* at 851:8–13). Defendant Thompson told Rachael Brock (Brock), the HR Manager at TAG, that he and Defendant Hogue owned TAG shares outside of the ESOP in "2014[.]" (*Id.* at 855:11–13, 877:15–21, 878:20–21). Brock was never instructed not to disclose information related to outside stock ownership nor was she ever asked whether the ESOP owned 100 percent of TAG. (*Id.* at 878:25–879:12). Finally, Mark Gilpin (Gilpin), an ESOP Participant, became aware of Defendant Hogue and Defendant Thompson's outside stock in 2014. (Doc. 276 at 993:11–13, 994:9–17). Neither Defendant Hogue nor Defendant Thompson instructed Gilpin to keep information related to their stock ownership confidential. (*Id.* at 994:18–20). Moreover, as noted above, Sharp and Knuckles learn at least by early 2015 that Defendants Thompson and Hogue had received shares outside of the ESOP as part of the 2011 Refinance. Sharp also discussed the ESOP with Defendant Thompson "[s]everal times" outside the weekly meetings and, according to Sharp, Defendant Thompson never "den[ied] that he owned stock outside the ESOP." (Doc. 275 at 917:19–24, 919:2–4).

Conversely, Brian Bearden (Bearden), a mechanical engineer at TAG, did not become aware of the ownership change until 2017 or 2018; but he acknowledged that he

did not "regularly attend[] staff meetings in the Albany office" and "never asked [Defendant] Thompson how much stock he had outside of the ESOP[.]" (Doc. 296 at 529:15–16, 537:8–13, 539:5–9). Likewise, Kerry Bunn (Bunn), another TAG employee, did not attend "the meetings when the ESOP was discussed," and never "ask[ed] [Defendant] Hogue or [Defendant] Thompson about their stock ownership in [TAG.]" (*Id.* at 696:13–15, 20–22). Wages, one of the two principal officers and original co-owners of TAG, served as a TAG board member from 2006 until "just prior to the closing of the 2011 transaction." (Doc. 272 at 76:10–12). Even though Wages did not negotiate or approve Defendants Hogue and Thompson's compensation increases, he was aware that in 2011 there was going to be a "potential change" "to the[ir] compensation[,]" and was "supportive of [Kirbo's] efforts to increase their compensation[.]" (Doc. 272 at 85:7–10, 103:21–104:1). Later, Wages testified that he learned that "the ESOP only owned 60 percent of [TAG] stock" in 2018, "shortly before the lawsuit was filed." (*Id.* at 106:14–22).

While external communications with prospective employees asserted that the ESOP owned 100 percent of TAG, there is no evidence that Defendants Thompson or Hogue proffered false information or instructed employees to spread the misinformation. Kristi Coates (Coates), former TAG HR specialist and recruiter, worked for TAG from 2015 to 2022. (Doc. 296 at 725:4–6). Prior to 2018, as part of her sales pitch, she described the ESOP "as owning [100] percent of [TAG]" and "hear[d] other recruiters providing similar information[.]" (*Id.* at 715:7–14; Doc. 309 ¶ 111; Doc. 310 ¶¶ 312–13). Coates never asked Brock, her supervisor, "about the percentage of ownership the ESOP had in [TAG]" and never spoke with or was told by Defendant Kirbo, Brock, Defendant Hogue, Defendant Thompson, or Irvin "that the ESOP owned 100 percent of [TAG] stock[.]" (Doc. 296 at 726:2–12, 728:2–19). Brock never "instruct[ed] [Coates] to [tell] recruits that the ESOP own[ed] 100 percent of TA[G,]" never "heard []Coates tell anyone that the ESOP owned a hundred percent of TA[G,]" and never "heard any other recruiters say that[.]" (Doc. 275 at 879:25–881:2). Coates also never told "[Defendant] Hogue or [Defendant] Thompson that [she] was telling other recruits that the ESOP owned a hundred percent [of TAG stock.]" (Doc. 296 at 728:24–729:2).

11

In April 2012 TAG applied for "Professional Corporate Licensure to Practice Engineering and/or Land Surveying in North Carolina[.]" (D0103 at 2). Marsha McKenzie (McKenzie), a corporate office administrator at TAG, was responsible for completing the application and requested information, including Defendants Hogue and Thompson's ownership percentages, to include in the application. (Doc. 296 at 743:2–4, 744:16–23; Doc. 309 ¶¶ 137–40; Doc. 310 ¶¶ 236–37; *see* D0103). Defendant Thompson filled out the specific percentages under "[e]xact [p]ercent of stock owned" for both himself and Defendant Hogue on the application, and "[gave] the document back to [McKenzie]" to "notarize[,] . . . scan[,] . . . [and] email[] . . . to . . . the NC Board of Examiners[.]" (D0103 at 5; Doc. 296 at 745:2–16). On April 19, 2012, McKenzie "include[d] the same information [Defendant] Thompson wrote and provided regarding the . . . exact percent of stock that he owned, that [Defendant] Hogue owned, and that the ESOP owned" in an email to Mark Mazanek with the North Carolina Board of Examiners. (Doc. 296 at 745:11–16, 746:20–747:2; D0091; *see* D0103).

Likewise, Leslie Pollock (Pollock), a TAG accounting manager who oversaw "personnel responsible for accounts receivable, accounts payable, and payroll," and handled "sales reporting, month-end reporting, income statements, and balance sheets," had access to information regarding ownership of ESOP shares in January 2014. (Doc. 296 at 772:6–14). Pollock issued dividend checks for the ESOP; and Irvin, TAG's business manager, gave Pollock documents that included the information needed to issue the dividend checks. (*Id.* at 773:10–13, 777:11–13). One such document called a "Consent Action of Board of Directors of Technical Associates of Georgia, Inc." sets forth the ESOP's shareholders and their respective dividends. (*Id.* at 777:14–778:20). The Consent Action of Board of Directors of Technical Associates of Georgia, Inc. form dated January 15, 2014, lists the shareholders as "Technical Associates of Georgia, Inc. Employee Stock Ownership Trust, John F. Hogue Jr., and Graham Thompson." (*Id.*). While Pollock did not understand, at the time, that the form was referring to "stock [Defendants] Hogue and []Thompson owned outside the ESOP," she also does not recall that Defendant Thompson or Defendant Hogue ever told her that the ESOP owned 100 percent of TAG stock. (*Id.* at

778:24–779:4; 781:3–11). On the other hand, Bret Henderson (Henderson), a former TAG structural engineer who worked at the Albany office was first informed that Defendants Hogue and Thompson had received additional compensation in connection with the 2011 Refinancing during a private meeting between himself and Defendant Thompson in 2017. (P1003 ¶¶ 2, 3, 17). Henderson suggested that Defendant Thompson explain this to TAG employees "in a town hall style meeting[,]" but Defendant Thompson refused. (*Id.*).

In addition to the fact that Defendants Hogue and Thompson discussed their ownership with several employees and made no overt effort to hide that information, the ESOP also met its reporting requirements and were audited; and there is no indication that any of the Defendants actively hid or failed to disclose required information. The ESOP filed the required Form 5500's[5] with the IRS on October 9, 2012. (J155 at 1). The audited Financial Report was attached to the ESOP's Form 5500 prepared by the ESOP's independent auditors, Maudlin & Jenkins. (J155 at 10–29; Doc. 296 at 677:16–25; P208; D1003 ¶ 113). As part of its engagement, the Mauldin & Jenkins auditors agreed to "provide an opinion on it in relation to the financial statements as a whole[,]" including "[r]eportable [t]ransactions" and "[n]onexempt [t]ransactions." (P208 at 1). The Mauldin & Jenkins auditors were also responsible for evaluating: "whether the financial statements are free of material misstatement[s,]" including misstatements from "violations of laws or governmental regulations, including prohibited transactions with parties in interest or other violations of ERISA rules and regulations, that are attributable to the Plan or to acts by management or employees acting on behalf of the Plan." (P208 at 2; Doc. 296 at 678:14–679:3). Mauldin & Jenkins also prepared TAG's separate Consolidated Financial Reports, which included detailed information regarding the 2011 Bank Refinancing and 2011 Employment Agreements. (D1002 ¶ 113; Doc. 296 at 673:2–25, 677:1–5, 679:22–681:18; J184 at 13).

---

[5]    IRS Form 5500, Annual Return/Report of Employee Benefit Plan is to be filed by "[t]he employer maintaining the plan or the plan administrator of a pension or welfare benefit plan covered by [ERISA]" and is used to report "information on the qualification of the plan, its financial condition, investments and the operations of the plan." *Form 5500 Corner*, IRS, https://www.irs.gov/retirement-plans/form-5500-corner (last visited March 23, 2026).

13

Mauldin & Jenkins was well aware of the terms of the 2011 Refinancing and 2011 Employment Agreements when it prepared the ESOP's audited Financial Report. (D1003 ¶ 113 (Thompson); Doc. 296 at 679:22–681:18; J184 at 13). If Mauldin & Jenkins believed that additional information regarding the 2011 Transactions was required to be disclosed in the ESOP's audited Financial Report, they were required to include that information under the terms of their engagement. (*See* P208 at 2). Ryan Inlow (Inlow), a senior Mauldin & Jenkins auditor who worked on the ESOP engagement, testified at trial that Mauldin & Jenkins would have included additional information regarding the 2011 Employment Agreements and the 2011 Bank Refinancing in the audited Financial Report if Mauldin & Jenkins felt, in its auditor's judgment, that it was necessary to include such information. (Doc. 296 at 681:19–683:14). Inlow did not recall anyone from TAG, including Defendants Hogue and Thompson, asking him to exclude such information from the audited Financial Report and that Maudlin & Jenkins would not have agreed to exclude that information from the Financial Report if they had been asked to do so. (*Id.*).

Moreover, Mauldin & Jenkins or Swerdlin, the ESOP's third-party administrator, never told Defendant Thompson that his "ownership of equity outside of the ESOP needed to be disclosed on the Form 5500 or in the notes to the audited financial statements." (D1003 ¶ 113; *see* Doc. 275 at 869:3–4). Nor did Mauldin & Jenkins advise him that "the 2011 Bank Refinancing or 2011 Employment Agreements constituted nonexempt prohibited transactions with any party-in-interest, which needed to be disclosed on the Form 5500 or in the notes to the attached audited financial statements." (*Id.*). Additionally, none of the information in the notes to the audited Financial Report was inaccurate. Note 6 accurately described the terms of the 2006 ESOP transaction. (J155 at 25; D1001 ¶ 175). Note 7 accurately described the terms of the 2011 Bank Refinancing. (J155 at 26). Although the notes did not affirmatively disclose Defendants Hogue and Thompson's ownership of stock outside of the ESOP, this additional information was not required under ERISA. (*See* Doc. 273 at 284:24–285:4). Jeffrey Krenzel, Plaintiffs' fiduciary expert witness, opined that the change in TAG ownership should have been disclosed to ESOP participants. (P1006 at 4). During cross-examination, however, Krenzel conceded that,

14

notwithstanding his opinion, "such a disclosure is not required under ERISA[.]" (Doc. 273 at 284:24–285:4).

Steven Sherman, Plaintiffs' damages expert, testified that the 2011 Refinance resulted in a loss to the ESOP. (*See* P1009). Sherman conducted two analyses in determining whether the ESOP would have been better off without the refinance: (1) Sherman calculated TAG's share price assuming that Defendants Hogue and Thompson had not received additional equity and that their compensation increased along the same trajectory as it had in 2006–2010, and (2) he calculated TAG's stock value assuming that Defendants Hogue and Thompson had not received any additional equity but received annual raises and bonuses as a result of the 2011 Refinance. (P1009 ¶ 25). Sherman determined that the share price would have been "materially higher" under either of the above scenarios than it was as a result of the 2011 Refinance. (P1009 ¶ 26). Sherman also calculated two components of losses to the ESOP resulting from the 2011 Refinance. He evaluated (1) the loss of value to the ESOP caused by the dilution of its ownership in TAG through December 2022, and (2) the dividends that the ESOP lost through December 2022 due to Defendants Hogue and Thompson receiving stock from the 2011 transactions. (P1009 ¶ 28). Sherman concluded that: (1) the loss due to dilution was $6,306,954, and (2) lost dividends to the ESOP totaled between $6,290,759 (if the Refinance happened without Defendants Hogue and Thompson receiving equity awards) and $17,788,868 (if the Refinance had not occurred at all). (P1009 ¶¶ 30, 33). At trial, Sherman conceded that he made a calculation error regarding the net interest savings related to the 2006 Seller Loans assuming they would not be paid off until 2021. (Doc. 296 at 554:1–555:6, 587:25–588:4). Sherman stated that this correction did not change his opinion that the 2011 Refinance caused loss to the ESOP. (Doc. 296 at 554:23–25, 629:1–5). Sherman clarified that this change in his analysis shows that the 2006 Seller Loans, without the refinancing, would have been paid off based on TAG's cash flow. (Doc. 296 at 629:7–12).

Defendants' expert witness in economic damages, Adrian Loud, raised a host of concerns with Sherman's analyses. (*See* Doc. 276 at 1060–1113; D1006). Loud testified that Sherman's opinions were unreliable because (1) Sherman did not conduct his own

15

valuation to evaluate the fairness of the transactions, (2) Sherman's loss theory contradicts the record, (3) Sherman, in an attempt to estimate the net benefit generated by refinancing the original 2006 Seller Loans, incorrectly calculates $44,000 instead of $811,000, (4) Sherman's analysis did not account for the fact that Defendants Hogue and Thompson would have left TAG if the 2011 Refinancing had not occurred, and TAG would have performed worse, financially, (5) Sherman's analysis did not consider that the ESOP would not have retained 97.2% ownership of TAG even without the Refinance, (6) Sherman failed to account for the shares and options already awarded to Defendants Hogue and Thompson in 2006, the warrants issued to Wages and Harrison during the 2006 Transactions, and options exercised by Gilpin, (7) Sherman assumes that the 2011 Transactions resulted in Defendants Hogue and Thompson being compensated in excess of fair market compensation, (8) Sherman's calculations include salary raises for Defendants Hogue and Thompson that were not adopted until 2016, (9) Sherman's reports contained numerous calculation errors, and (10) Sherman's "hindsight" analysis does not evaluate what an appropriate level of equity dilution to the ESOP would be. (*See* D1006; Doc. 276 at 1060–64). Loud determined that the dilutive effect of the 2011 Transactions to the ESOP's equity ownership is closer to 16.6%, not 36.9% as asserted by Sherman. (D1006 ¶ 23). Loud testified, after considering Sherman's analysis in its entirety, Sherman did not "calculate any actual loss to the ESOP[.]" (Doc. 276 at 1082:7–8).

Overall, the ESOP benefited from the 2011 Refinance. Not only did the value of the individual participants'—including Plaintiff Gamache's—ESOP accounts increase between 2011 and 2022, TAG's revenues also increased after the 2011 Refinance. (*See* Doc. 273 at 503:8–13, 504:11–18; Doc. 272 at 231:13–25; Doc. 296 at 695:6–14, 753:8–20; Doc. 275 at 847:14–16, 881:3–6). While Plaintiffs argue that the increases were not as much as they would have been absent the 2011 Refinance, the evidence does not bear that out. (D0359, D0363, D0364, D0366, D0367). Moreover, considering the expert testimony, while there were dilutive effects on the ESOP's equity ownership as a result of the 2011 Refinance, that effect was much smaller than asserted by Plaintiffs and was offset by the benefit to TAG of retaining Defendants Thompson and Hogue.

**CONCLUSIONS OF LAW**

## I.     Jurisdiction

This Court previously has determined that Plaintiff's claims implicate ERISA; and thus, that the Court has subject matter jurisdiction. *Gamache v. Hogue*, 446 F. Supp. 3d 1315, 1324 (M.D. Ga. 2020) (citing *Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1221 (11th Cir. 2008) ("When a plaintiff makes a plausible argument that a federal statute creates his right to relief, the district court has subject-matter jurisdiction over that complaint."). "ERISA completely preempt[s] the area of employee benefit plans and thus converts state law claims into federal claims when the state law claim is preempted by ERISA and also falls within the scope of the civil enforcement section of ERISA, Section 502(a), 29 U.S.C. § 1132(a)." *Franklin v. QHG of Gadsden, Inc.*, 127 F.3d 1024, 1028 (11th Cir. 1997) (internal quotations omitted). "To sum up, the jurisdictional issue . . . turns on whether the plaintiffs are seeking relief that is available under 29 U.S.C. § 1132(a)." *Id.* (citing *Kemp v. Int'l Bus. Mach. Corp.*, 109 F.3d 708, 712 (11th Cir. 1997)). "An ERISA plan exists whenever there are intended benefits, intended beneficiaries, a source of financing, and a procedure to apply for and collect benefits." *Butero v. Royal Maccabees Life Insur. Co.*, 174 F.3d 1207, 1214 (11th Cir. 1999) (internal quotations and citation omitted). It is undisputed that Plaintiffs were former employees of TAG and participants in the TAG ESOP, such that ERISA preempts Plaintiffs' claims, providing a basis for federal question jurisdiction.

## II.    Timeliness

Section 1113 of Title 29 of the U.S. Code provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. Section 1113(1) is considered a statute of repose expressing Congress' intent to shield defendants from liability after the applicable three or six year period. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 180 (2020) ("We have referred to § 1113(1) as a statute of repose, which 'effect[s] a legislative judgment that a defendant should be free from liability after the legislatively determined period of time.'"). The subsection "bars any action brought more than six years after the date of the fiduciary's 'last action' that constituted the alleged breach" or in the case of an omission, "the last date on which the fiduciary could have cured the breach[.]" *Sec'y, U.S. Dep't. of Lab. v. Preston*, 873 F.3d 877, 883 (11th Cir. 2017). Section 1113(2) is considered a statute of limitations that is intended to encourage "plaintiffs to pursue diligent prosecution[.]" *Sulyma*, 589 U.S. at 181. The subsection bars any action brought more than three years after a plaintiff gains actual knowledge of the breach or violation. *See id.* at 183–84.

ERISA's periods of repose and limitations may be tolled under the fraud or concealment exception. *See* 29 U.S.C. § 1113. Plaintiffs bear the burden of proving that the fraud and concealment exception applies under § 1113. *See George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 848–49 (N.D. Ill. 2011) (collecting cases); *see Lockhart v. S. Health Plan, Inc. Plan Adm'r*, No. 4:04-CV-0006-WLS-MSH, 2012 WL 1576160, at *7–8 (M.D. Ga. May 4, 2012), *aff'd* 503 F. App'x 926 (11th Cir. 2013) (placing burden on plaintiffs); *Harris v. Koenig*, 815 F. Supp. 2d 12, 20 (D.D.C. 2011) (same); *Moyle v. Liberty Mut. Ret. Benefit Plan*, 263 F. Supp. 3d 999, 1011–12 (S.D. Cal. 2017) (same). At trial and in the subsequent briefings, the Parties disputed whether Plaintiffs satisfied their burden to prove that the fraud or concealment exception tolls the statute of repose. (Doc. 276 at 957:4–974:16) "In order to constitute fraud or concealment such that the six year

18

statute of limitations is applicable, a plaintiff must establish that the defendant engaged in 'an active step of concealment[.]'" *Lockhart*, 2012 WL 1576160, at *7 (quoting *Mellon Bank, N.A. ex rel. Weiss Packing Co., Inc. Profit Sharing Plan v. Levy*, 71 F. App'x 146, 148 (3d Cir. 2003)). This requires conduct "beyond the breach itself that has the effect of concealing the breach from its victims." *Id.* (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 503 (3d Cir. 2001)); *see also Corral v. S. Cal. Gas Co.*, 210 F.3d 382, 382 (9th Cir. 2000) ("[T]here must be evidence that the employer either attempted to defraud the plaintiff or concealed its fiduciary breach."); *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996) (applying fraudulent concealment requirements to § 1113); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994) ("There must be actual concealment—i.e., some trick or contrivance intended to exclude suspicion and prevent inquiry.") (internal quotation marks and citation omitted); *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1095 (7th Cir. 1992) (requiring actual concealment). "[T]here must be evidence that the defendant took *affirmative* steps [at any point] to hide its breach of fiduciary duty." *Lockhart*, 2012 WL 1576160, at *7 (internal quotation marks and citations omitted).

Plaintiff argues that the affirmative steps requirement does not apply because Defendants had a fiduciary responsibility to disclose and because the "wrong is of such a character as to be self-concealing." (Doc. 309 ¶ 276 (citation omitted)). Plaintiffs further allege that Defendants engaged in affirmative acts of fraud or concealment by (1) not including, in the August 16, 2011 email, that the 2011 Refinance resulted in Defendants Hogue and Thompson owning approximately 40% of TAG, (2) not correcting and/or misleading ESOP participants who "asked questions indicating a belief that the ESOP owned 100% of [TAG,]" and (3) concealing Defendant Urbach's identity when Plaintiff Gamache sought information. (Doc. 304 at 17). Plaintiffs further allege that there is no evidence to suggest that any class member, prior to 2018, knew that Defendants Hogue and Thompson acquired outside stock. (*Id.*).

Plaintiffs bear the burden of proving that the fraud and concealment exception applies under § 1113. *See George*, 814 F. Supp. at 848–49 (collecting cases); *see also*

*Lockhart*, 2012 WL 1576160, at *7–8 ("In order to constitute fraud or concealment such that the six year statute of limitations is applicable, a plaintiff must establish that the defendant engaged in an active step of concealment") (internal quotations omitted); *Resnick v. Schwartz*, 430 F. Supp. 3d 492, 499 (N.D. Ill. 2019) ("Although the statute of limitations is, generally speaking, an affirmative defense, fraudulent concealment is an expansion of the ordinary statute of limitations, so it is the plaintiff's burden to show that the exception applies."); *Harris*, 815 F. Supp. at 20 (placing burden of proof on plaintiffs); *Moyle*, 263 F. Supp. at 1011–12 (same). Despite the authority to the contrary, Plaintiffs have argued that Defendants bear the burden of proving that each of Plaintiffs' claims are barred by the statute of repose. (Doc. 308 at 5). Plaintiffs are wrong. Placing the evidentiary burden on a defendant to prove that they did not fraudulently conceal information in order for the normal statute of repose to apply would turn the statute of repose on its head and make the exception the rule. The cases Plaintiffs cite do not support their position. The only Eleventh Circuit case Plaintiffs cited, *McElroy by McElroy v. Firestone Tire & Rubber Co.*, 894 F.2d 1504 (11th Cir. 1990), is a products liability action, not an ERISA case. *McElroy* stands for the proposition that a defendant bears the burden to prove that the statute of repose applies under Florida law. *Id.* at 1507, n.4. *McElroy* did not address who bears the burden of proving that an exception to the statute of repose applies, let alone address ERISA's fraud or concealment exception. *Id.* Plaintiffs also cite to a District of Minnesota case, *Morin v. Essentia Health*, 2017 WL 4083133 (D. Minn. Sept. 14, 2017). *Morin* relied on another products liability case that explained "any exception to the statutes of limitation should be used only in exceptional circumstances and the burden of proving the exception lies with the parties who seek to claim the benefit of the exception." *See Integrity Floorcovering, Inc. v. Broan-Nu Tone LLC*, 503 F. Supp. 2d 1136, 1141 n.2 (D. Minn. 2007) (internal quotations and citations omitted) (emphasis added). *Morin* thus directly contradicts Plaintiffs' position. It is Plaintiffs—not Defendants—who seek to circumvent ERISA's six-year statue of repose and receive the benefit of an exception. Plaintiffs—not Defendants—therefore bear the burden to prove that the exception applies. Notably, even if Defendants did bear the burden of establishing that the exception applies

to the § 1113 six-year statute of repose, Defendants did so by showing that they did not actively conceal information about the 2011 Refinance, their ownership of the ESOP, or their 2011 Employment Agreements.

The fraudulent concealment doctrine under § 1113 requires that Plaintiff prove that each individual defendant engaged in an affirmative act of concealment. *Lockhart*, 2012 WL 1576160, at *7–8; *Turner v. Allstate Ins. Co.*, 491 F. Supp. 3d 1190, 1213 (M.D. Ala. 2020), *aff'd sub nom. Klaas v. Allstate Ins. Co.*, 21 F.4th 759 (11th Cir. 2021); *Griffin v. Aetna Health Inc.*, No. 1:17-CV-77-AT, 2017 WL 4423419, at *5 (N.D. Ga. June 21, 2017), *aff'd*, 740 F. App'x 169 (11th Cir. 2018). "There must be actual concealment—i.e., some trick or contrivance intended to exclude suspicion and prevent inquiry." *Larson*, 21 F.3d at 1173 (internal quotations and citations omitted). The "facts constituting the claim for breach of fiduciary duty alone cannot also serve as the basis for fraud or concealment— otherwise, the exception would swallow the rule." *Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1057 n.10 (9th Cir. 2020). Furthermore, affirmative concealment may not be inferred from mere silence or failure to volunteer information. *Lockhart*, 2012 WL 1576160, at *7–8. Because actual concealment requires affirmative acts on the part of each defendant, "[c]oncealment by mere silence is not enough." *Martin*, 966 F.2d at 1094 (internal quotations and citations omitted); *see also Larson*, 21 F.3d at 1172 ("While a fiduciary's mere silence could, in some circumstances, amount to fraud, it would still fall short of the fraudulent concealment that courts have required for purposes of § 1113."); *Schaefer v. Ark. Med. Soc'y*, 853 F.2d 1487, 1491 (8th Cir. 1988) (holding that active concealment under ERISA § 413, 29 U.S.C. § 1113 requires "more than merely a failure to disclose"); *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1226 (N.D. Cal. 2008) ("active concealment… is more than merely a failure to disclose"). The fraudulent concealment exception under § 1113 does not, as Plaintiffs suggest, impose affirmative disclosure obligations on ERISA fiduciaries. (*See* Doc. 309 ¶ 283; Doc. 304 at 16–17). Even though ERISA fiduciaries have a duty to disclose accurate information to beneficiaries, the fraud or concealment exception "does not apply simply because an ERISA fiduciary fails to disclose material information." *DeFazio v. Hollister, Inc.,* 636 F.

21

Supp. 2d 1045, 1058 (E.D. Cal. 2009), *aff'd in part sub nom. DeFazio v. Hollister Emp. Share Ownership Tr.*, 612 F. App'x 439 (9th Cir. 2015).

Moreover, the "fraud or concealment" exception applies only when "the defendant himself has taken steps to hide his breach." *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1402 (9th Cir. 1995)) (collecting cases). ERISA's statute of repose is not tolled as to claims asserted against defendants who did not actually engage in the acts designed to conceal the alleged fiduciary breaches. *See id.* (holding that successor fiduciaries' acts of fraud and concealment did not toll the statute of limitations as to ERISA claims against prior fiduciaries); *see also Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir. 1996) ("[W]hen a lawsuit has been delayed because the defendant itself has taken steps to hide its breach of fiduciary duty, the limitations period will run six years after the date of the claim's discovery. The relevant question is therefore not whether the complaint 'sounds in concealment,' but rather whether there is evidence that the defendant took affirmative steps to hide its breach of fiduciary duty." (citation omitted)); *Harris v. Koenig*, 722 F. Supp. 2d 44, 61 (D.D.C. 2010) (holding that ERISA's fraud or concealment exception does not toll the statute of limitations as to defendants that are "not alleged to have participated in the acts of fraud or concealment"); *DeFazio*, 636 F. Supp. 2d at 1062 (statute of limitations cannot be tolled as to claims asserted against defendants who did not actually engage in fraud or concealment).

Plaintiffs' argument that "affirmative acts [of concealment] are unnecessary" where a party is a fiduciary is equally unavailing. (*See* Doc. 304 at 16). Crucially, Plaintiffs failed to cite any authority from within the Eleventh Circuit that adopts their position. Throughout this case, Plaintiffs have failed to cite to any applicable ERISA cases whatsoever. Rather, the cases upon which they rely are related to a variety of unrelated laws such as the Petroleum Marketing Practices Act, the Mandatory Victims Restitution Act, the Racketeer Influenced and Corrupt Organizations Act, and the Survival and Wrongful Death Act, among others. The only Eleventh Circuit authority Plaintiffs have relied on is dicta found in a footnote in a 1987 decision regarding the Petroleum Marketing Practices Act, *Hill v. Texaco*, 825 F.2d 333 (11th Cir. 1987), which provides that, "[a]s a general rule, a plaintiff

relying on the doctrine of fraudulent concealment must show affirmative actions by the defendant constituting concealment. He must also show that he exercised diligence to discover his cause of action within the limitations period." 825 F.2d at 335 (citations omitted). Plaintiffs rely on a footnote that states: "There are two exceptions to this rule. The first is where the defendant has a fiduciary responsibility to make disclosure. . . The second exception is where the wrong is of such a character as to be self-concealing . . . Of course, under either of these exceptions, the plaintiff still must show that he exercised due diligence to discover his cause of action." *Id.* at 335 n.2. Thus, even if the Court were to rely on *Hill* for the proposition that these exceptions to the affirmative acts requirement applied to ERISA actions, Plaintiffs would have to establish that they exercised diligence to discover the alleged breaches and omissions within the six-year period of repose. *See id.*

The evidence at trial demonstrated that Defendants Hogue and Thompson voluntarily disclosed their ownership of ESOP stock on multiple occasions to multiple different TAG employees, including to Marsha McKenzie, Leslie Pollock, Mark Gilpin, Jimmy Sharp, Steven Knuckles, Jody Funderburk, Paul Bryan, Jason Irvin, Rachel Brock, and even Plaintiff Nelson Gamache. (*See generally* D1003 ¶¶ 107–09; Doc. 273 at 367:14–368:13). Importantly, there is no evidence that Defendants actively concealed any material information. While Plaintiffs correctly argue that the fact that employees like McKenzie and Pollock had possession of documents that set forth the terms of the 2011 Refinancing, including that Defendants Thompson and Hogue owned stock outside of the ESOP, is not evidence that Plaintiffs had actual knowledge of this information, the fact that the Defendants made such information available is evidence from which the Court can find that Defendants did not actively conceal the information.

Moreover, the fact that Defendants did not include all of the specifics of the 2011 Refinance or the ESOP's ownership in the Form 5500 is not evidence that any of the Defendants engaged in an affirmative act of concealment. *See Appvion, Inc. Retirement Savings & Employee Stock Ownership Plan v. Buth*, 99 F.4th 928, 942 (7th Cir. 2024) (holding that failure to disclose information in Forms 5500 does not constitute fraud or concealment under ERISA). First, it must be noted that the Form 5500 did not require

23

disclosure of the ESOP's ownership percentage. It only required the ESOP to disclose the total value of the TAG shares that the ESOP owned. (J155 at 1–8). Moreover, because actual concealment requires affirmative acts on the part of each defendant, "concealment by mere silence is not enough." *Martin*, 966 F.2d at 1094; *see also Larson*, 21 F.3d at 1172 ("While a fiduciary's mere silence could, in some circumstances, amount to fraud, it would still fall short of the fraudulent concealment that courts have required for purposes of § 1113."); *Schaefer*, 853 F.2d at 1491 (holding that active concealment under § 1113 requires "more than merely a failure to disclose"). Even though ERISA fiduciaries have a duty to disclose accurate information to beneficiaries, the fraud or concealment exception "does not apply simply because an ERISA fiduciary fails to disclose material information." *DeFazio,* 636 F. Supp. 2d at 1058.

Accordingly, as the evidence does not establish that any Defendant engaged in affirmative acts of concealment, the fraudulent concealment exception does not operate to toll the limitations period set forth in Section 1113.

I.      **Prohibited Transaction Claims (Counts I and II)**

Plaintiffs contend that Defendants breached their fiduciary duties by engaging in or failing to remedy the 2011 Transactions. (*See* Doc. 304 at 7–12). Count I alleges that Defendants Hogue and Thompson engaged in a prohibited transaction, because as ESOP fiduciaries they received consideration for their personal accounts in connection with a transaction involving plan assets in violation of § 1106(b)(1) and (3). (Doc. 30 ¶¶ 80–86). Count II alleges that Defendant Urbach caused the ESOP to engage in prohibited transactions, and that Defendants Hogue and Thompson knowingly participated in those transactions in violation of § 1106(a)(1)(D). (*Id.* ¶¶ 87–92). These allegations are allegations of fiduciary breaches based on violations. *See Gamache*, 446 F. Supp 3d at 1330. Accordingly, the limitations period is the earlier of "(1) six years after (A) the date of the last action which constituted part of the breach or violation, or . . . (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113.

In Count I, Plaintiffs argue that Defendants Hogue and Thompson engaged in a prohibited transaction because they were fiduciaries who received consideration for their personal accounts in connection with a transaction involving plan assets. (Doc. 304 at 7). Plaintiffs argue that the breach occurred when the 2011 Employment Agreements that restructured Defendants Hogue and Thompson's compensation were approved. (Doc. 242-3 ¶ 25; J098; J099). The last date that Defendants could have assessed the prudence of moving forward with the 2011 Employment Agreements was August 22, 2011, the date the Board voted to approve the transaction. (Doc. 242-3 ¶ 25). Because Plaintiff Gamache knew that Defendants Hogue and Thompson held stock outside of the ESOP by early 2015, Plaintiffs had until the earlier of six years after August 2011 or three years after 2015 to bring this claim. Thus, Plaintiffs had until August 2017 to bring this claim.[6] As the fraud concealment exception does not apply, Count I is time-barred; and Defendants are entitled to judgment as a matter of law.

In Count II, Plaintiffs contend that Defendant Urbach caused the prohibited transaction to benefit Defendants Hogue and Thompson, and that Defendants Hogue and Thompson knowingly participated in the transaction. (Doc. 304 at 9–10). Plaintiffs argue that the original breaches were the 2011 Refinancing and the 2011 Employment Agreements. (*See id.*). The breaches occurred on the dates that the TAG Board voted to approve the transactions—August 18, 2011 (the date the Board voted to approve acceptance of the refinance loan) and August 22, 2011 (the date the Board voted to approve the new employment agreements). (Doc. 242-3 ¶¶ 24, 25). As with Count I, Plaintiffs had until August 2017 to bring this claim. As the fraud concealment exception does not apply, Count II is time-barred; and Defendants are entitled to judgment as a matter of law.

## II.   Breach of Fiduciary Duty and Duty to Monitor Claims (Counts III and IV)

Plaintiffs maintain that because their co-fiduciary liability claims in Count III and duty to monitor claims in Count IV are claims of omission, they are timely under the statute of repose regardless of whether the fraud or concealment exception applies. (Doc. 304 at

---

[6]      Because Plaintiff Nofi did not have actual knowledge that Defendants Hogue and Thompson held stock outside of the ESOP until 2018, the six year statute of repose applies.

25

16). Count III alleges that Defendant Urbach breached his fiduciary duties under § 1104(a)(1) by approving the 2011 Refinancing, and that he and the Committee Defendants breached their duties under §§ 1104(a) and 1105(a) by failing to remedy the prohibited transactions alleged in Counts I and II. (Doc. 30 ¶¶ 93–107). Count IV alleges that the Director Defendants breached their duties under § 1104(a)(1)(A)–(B) by failing to monitor or take appropriate action against Defendants Urbach, Hogue, and Thompson. (*Id.* ¶¶ 108–13). The allegations in Counts III and IV are allegations of fiduciary breaches based on omissions. *Gamache*, 446 F. Supp. 3d at 1330. Accordingly, the limitations period is the earlier of "(1) six years after . . . the latest date on which the fiduciary could have cured the violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113.

In Count III, Plaintiffs argue that Defendant Urbach, as TAG's trustee, caused the ESOP to engage in prohibited transactions and failed to ensure that participants were properly informed about the full terms of the 2011 Refinance. (Doc. 304 at 13). Plaintiffs also argue that the Committee Defendants breached their fiduciary duties by failing to remedy those breaches by either bringing a legal action against Defendant Urbach or fixing the transaction. (*Id.*). Plaintiffs argue that the original breach occurred when Defendants Urbach, Hogue, Thompson, and Kirbo approved or failed to remedy the prohibited transaction, the 2011 Refinance. Under the statute of repose, to the extent that the 2011 Refinance was a prohibited transaction, Plaintiffs had six years from August 2011 to bring suit for any breach of the Defendants fiduciary duties attendant to their approval or failure to remedy it. Thus, Plaintiffs had until August 2017 to bring this action. As the fraud concealment exception does not apply, Count III is time-barred; and Defendants are entitled to judgment as a matter of law.

In Count IV, Plaintiffs allege that the Director Defendants breached their duties under § 1104(a)(1)(A)–(B) by failing to monitor or take appropriate action against Defendants Urbach, Hogue, and Thompson. (Doc. 304 at 13). As stated above, the evidence shows that Plaintiff Gamache had actual knowledge of the shares that Defendants Thompson and Hogue received as part of the 2011 Refinance in 2015, at the latest. Thus,

Plaintiff Gamache had until the earliest of either 2017—six years after the prohibited transaction—or 2018—three years after his discovery to bring this claim. As Plaintiff Nofi did not become aware of the change in ownership until 2018, to the extent that the approval of the 2011 Employment Agreements constitute a prohibited transaction, Plaintiff Nofi had until August 2017 to bring this claim. As the fraud concealment exception does not apply, Count IV is time-barred, and Defendants are entitled to judgment as a matter of law.

## III.    Pending Motions

Toward the close of trial, Defendants moved for judgment on the merits under Rule 52(c). (Doc. 276 at 953:4–5). The Court declined to render judgment until the close of the evidence. (Doc. 276 at 958:24–959:2). Defendants' Motion under Rule 52(c) is **DENIED as moot**.

## CONCLUSION

Accordingly, the Court finds in favor of Defendants. The Clerk of Court is **DIRECTED** to enter the appropriate judgment and to **CLOSE** this case.

**SO ORDERED**, this 30th day of March, 2026.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**